# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| **MICHAEL RAY STAFFORD,** *et al.* | ) |
|        **Plaintiffs,** | ) |
| | ) |
|     **v.** | ) **CASE NO.  1:17-cv-00289-JMS-MJD** |
| | ) |
| **ROBERT E. CARTER, Jr.,** *et al.* | ) |
|        **Defendants.** | ) |

## STATE DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs bring claims, on their own behalf and on behalf of a class of all offenders incarcerated in the Indiana Department of Correction ("IDOC") who have chronic Hepatitis C ("HCV"), asking this Court to enjoin the Indiana Department of Correction's policies concerning the treatment of offenders who have been diagnosed with chronic HCV and order that they all immediately receive a course of treatment with a direct-acting antiviral medication. Plaintiffs bring claims under the Eighth Amendment to the United States Constitution, alleging deliberate indifference to their serious medical needs, under Title II of the Americans with Disabilities Act, and under the Rehabilitation Act. Plaintiffs' claims cannot succeed, and Defendants are entitled to summary judgment, because the undisputed facts show that IDOC's policy for the management of offenders with chronic HCV places treatment decisions in the hands of the medical professionals employed by its contracted medical vendor, Wexford of Indiana. Plaintiffs' request that this Court adopt the recommendations and guidance of a private health organization to govern the medical care provided to offenders who have chronic Hepatitis C is unsupported by the law and should be denied.

IDOC has promulgated a policy concerning management of offenders who have HCV. The policy does not dictate the treatment provided to any individual offender, but expressly authorizes the use of a clinician's professional medical judgment. The policy does not categorically approve or deny treatment for any individual, but provides guidance for use by the medical professions who provide day-to-day medical care to the offender population. Such a policy, which expressly permits the use of professional medical judgment by medical professionals, embodies consistent holdings by the courts that medical decisions for offenders should be made by medical professionals considering the individualized circumstances of a particular offender and not by prison administrators. Because Plaintiffs cannot show that the policies and practices put in place by IDOC express deliberate indifference to their medical needs, their claims cannot succeed and summary judgment for Defendants should be entered. In addition, because Plaintiffs' complaint concerns their access to a specific category of prescription drugs, which are made available to offenders following an individual evaluation of their medical conditions, Plaintiffs' claims under the ADA and the Rehabilitation Act cannot succeed either. The Court should enter summary judgment for Defendants.

## I.   Statement of Material Facts not in Dispute

### A.   Background

1. IDOC's Chief Medical Officer, Dr. Van Ness, was a board certified family physician, but he stopped practicing medicine in 1997. (Dkt 173-1, p. 16, 18; Van Ness Dep. 20:21; 22:23-24.)

2. Dr. Van Ness has never met any of the Plaintiffs. (Dkt 173-1, p. 14; Van Ness Dep 18:24-5.) He has never examined them or reviewed their medical records. (Dkt 173-1, p. 15; Van

Ness Dep. 19:6-11.) Dr. Van Ness does not make treatment decisions for offenders. (Dkt 173-1, p. 95; Van Ness Dep. 123:7-9.)

3. Other than possible first aid or emergency response, no IDOC employee provides direct patient care to offenders. (Dkt 173-1, p. 95; Van Ness Dep. 123:10-13.)

4. As the Chief Medical Officer, Dr. Van Ness's primary role is to oversee the quality of IDOC's medical vendor, Wexford, which provides medical care to offenders incarcerated in IDOC. (Dkt 173-1, p. 19; Van Ness Dep. 23:3-18.)

5. Wexford employees provide direct care to incarcerated offenders. (Dkt 173-1, p. 19-20; Van Ness Dep. 23:24-24:4.) All patient decisions are made by medical vendor staff. (Dkt 173-1, p. 95; Van Ness Dep. 123:14-16.)

6. During a September, 2017, meeting between Wexford and IDOC, Dr. Fisher and John Dallas told IDOC that "we feel like we should treat more offenders at this point," which Dr. Van Ness approved of. (Dkt 173-1, p. 37; Van Ness Dep. 65:2-13.)

7. However, Dr. Van Ness has never received a formal written request from Wexford for additional funding for direct-acting antivirals ("DAA") to treat offenders with HCV. (Dkt 173-1, p. 38; Van Ness Dep. 66:7-20.)

8. Dr. Van Ness's understanding is that Wexford nevertheless began treating more offenders with DAAs. (Dkt 173-1, p. 38; Van Ness Dep. 66:17-20.)

9. Although 3,863 offenders were listed as having HCV in September, 2017, that number changes every month as offenders move in and out of IDOC. (Dkt 173-1, p. 40; Van Ness Dep. 68:14-25.) There are more than 25,000 offenders in IDOC, and approximately 18,000 offenders enter IDOC or are returned to the community each year. (Dkt 173-1, pp. 59-60; Van Ness Dep. 87:17-88:4.) Accordingly, the number of offenders who fall into each

priority level for treatment, discussed further below, changes as well. (Dkt 173-1, p. 96; Van Ness Dep. 124:1-17.)

10. Dr. Van Ness doesn't know if everyone with a high priority is being treated with a DAA, because "you have to look at the person and their whole spectrum of lab, physical exam, and other tests that might need to be done at the discretion of the medical team" to determine who to treat. (Dkt 173-1, p. 52; Van Ness Dep. 80:11-22.)

11. The American Association for the Study of Liver Diseases ("AASLD") guidance for Hepatitis C was not rejected because it was too expensive. (Dkt 173-1, p. 64; Van Ness Dep. 92:4-6.)

12. IDOC and Wexford follow the Federal Bureau of Prisons ("FBOP") guidelines for management of HCV. (Dkt 173-1, pp. 65-66; Van Ness Dep. 93:11-14; 94:15-18.)

13. Dr. Van Ness does not decide which offenders receive treatment with a DAA. (Dkt 173-1, p. 72-73; Van Ness Dep. 100:24-101:2) The determination as to who receives a DAA is made by the medical team. (Dkt 173-1, p. 73; Van Ness Dep. 101:3-15.)

14. IDOC's contract with Wexford, which began before Dr. Van Ness was hired, provides special consideration for Hepatitis C treatment. (Dkt 173-1, pp. 78, 80; Van Ness Dep. 106:15-16; 108:16-20.) The contract requires Wexford to place $1.5 million in escrow annually budgeted exclusively for hepatitis C treatment. (Dkt 173-1, p. 79; Van Ness Dep. 107:13-19.)

15. The budget is a guideline. (Dkt 173-1, p. 82; Van Ness Dep. 110:10-15.)

16. Dr. Van Ness has not requested expenditures of over $1.5 million for treatment of offenders with HCV. (Dkt 173-1, p. 81; Van Ness Dep 109:24-110:1.) Wexford has not submitted a request to expend over $1.5 million for the treatment of HCV. (Dkt 173-1, pp. 82, 95; Van

Ness Dep. 110:2-5; 123:17-25.) As it operates on a yearly budget, any expenditure over $1.5 million would come from IDOC, so IDOC would need to pre-approve any pharmacy expenditures for treatment of Hepatitis C of over $1.5 million per year. (Dkt 173-2, pp. 74-75; Fisher Dep. 136:22-137:2.)

17. $1.5 million is a significant amount of money in any pharmacy budget. (Dkt 173-2, p. 70; Fisher Dep. 132:18-24.) A specific requirement for a budget line-item of $1.5 million in the contracting process evens the playing field so that one company could not underbid the medical vendor contract by planning to treat few offenders with DAAs, or by ignoring the potential cost of the treatment, which would reduce the total expected cost of the medical vendor contract. (Dkt 173-2, p. 74; Fisher Dep. 136:1-12.)

18. The contract requests that Wexford employ an infectious disease or hepatology expert to assist with priority of treatment for offenders with Hepatitis C. (Dkt 173-1, p. 85; Van Ness Dep. 113:6-11.) Wexford has told Dr. Van Ness that they employ such an expert. (Dkt 173-1, p. 85; Van Ness Dep. 113:15-16.)

19. Dr. Van Ness is not aware of any IDOC policy with respect to HCV that categorically denies offenders access to programs or services. (Dkt 173-1, p. 87; Van Ness Dep. 115:11-14.)

20. Plaintiff Douglas Smith understands that the policy grants authority to prescribe DAA medications for HCV to the medical provider. (Dkt 173-5, pp. 8, 18; D. Smith Dep 159:2-6; 169:2-5.)

21. Plaintiff Douglas Smith understands Dr. Person determined that he did not need DAA medication based upon his then current lab results. (Dkt 173-5, p. 8; D. Smith Dep 159:7-11.)

22. Plaintiff Douglas Smith has no evidence that Dr. Person's conclusion was based upon anything other than lab results. (Dkt 173-5, p. 8; D. Smith Dep 159:12-17.)

23. Plaintiff Douglas Smith is not aware of any policy that constrained his physician's decision-making. (Dkt 173-5, p. 14; D. Smith Dep 165:8-11.)

24. Plaintiff Charles Smith does not know if any decisions regarding his HCV have been made pursuant to any written policy. (Dkt 173-6, p. 8; C. Smith Dep 158:9-13.)

25. Plaintiff Michael Stafford does not know about any policies of Wexford or the IDOC concerning HCV. (Dkt 173-7, pp. 8, 15-16; M. Stafford Dep 95:16-22; 111:23-112:7.)

   **B. <u>The Natural Progression of Hepatitis C</u>**

26. The natural history of Hepatitis C is varied for various patient populations, but, in general, an assumption has been made that it takes 20 percent of people infected with HCV twenty years to develop cirrhosis. (Dkt 173-3, p. 7; Vuppalanchi Dep. 17:5-8.)

27. The speed of progression is based on a number of factors, including age, obesity, concomitant infections, and alcohol and drug use. (Dkt 173-3, p. 7; Vuppalanchi Dep. 17:15-24.)

28. One method of staging a patient's HCV is through measurement of liver fibrosis, which can be directly measured through a liver biopsy, but also estimated with blood tests or other testing devices. (Dkt 173-3, p. 8; Vuppalanchi Dep. 18:2-23.)

29. The Metavir Fibrosis score is a histologic score that grades liver fibrosis in five stages. (Dkt 173-3, p. 8; Vuppalanchi Dep. 18:16-19.)

30. Fibrosis Score 0 is described as no evidence of fibrosis. (Dkt 173-3, p. 8; Vuppalanchi Dep. 18:25.)

31. Fibrosis Score 1 is described as "very limited to fibrosis on the portal tracks." (Dkt 173-3, p. 9; Vuppalanchi Dep. 19:1-2.)

32. Fibrosis Score 2 is described as fibrosis that extends beyond the portal tracks. (Dkt 173-3, p. 9; Vuppalanchi Dep. 19:3-5.)

33. Fibrosis Score 3 is described as fibrosis that is bridging, where fibrosis starts from the portal tracks and goes up to the center vein of the liver. (Dkt 173-3, p. 9; Vuppalanchi Dep. 19:5-7.)

34. Fibrosis Score 4 is where nodules form and is indicative of cirrhosis. (Dkt 173-3, p. 9; Vuppalanchi Dep. 19:7-8.) Cirrhosis creates a "possibility of developing portal hypertension that would lead to complications related to cirrhosis" and "increases the risk of hepatocellular cancer." "[I]t is an important clinical end point…because the risks associated with liver disease increase exponentially." (Dkt 173-3, p. 13; Vuppalanchi Dep. 23:1-8.)

35. "A small amount of scar tissue in the liver does not affect the liver's function. It's a large organ." With "extensive fibrosis, which leads to cirrhosis when there's extensive scarring in the liver, the impairment of the liver at that time will cause clear issues with the body." (Dkt 173-2, p. 18; Fisher Dep. 67:10-15.)

36. "Severe extrahepatic manifestations" in patients with chronic HCV are rare. (Dkt 173-2, p. 55; Fisher Dep. 105:13-20.)

37. One study showed that over a twenty year period, 15.3 percent of patients who were staged at Fibrosis level 0 or 1 progressed to stage 3 or 4. (Dkt 173-2, p. 61; Fisher Dep. 111:1-12.)

38. The progression of HCV can also be estimated by a measurement of liver stiffness with a device called a Fibroscan that gives a non-invasive window into the status of liver fibrosis. (Dkt 173-3, p. 8; Vuppalanchi Dep. 18:2-12.)

39. An APRI score is another method of measuring progression of Hepatitis C. (Dkt 173-3, p. 12; Vuppalanchi Dep. 22:5-9.)

40. An APRI score is a biomarker based on routinely available blood tests used to predict the amount of fibrosis in the liver. (Dkt 173-3, p. 12; Vuppalanchi Dep. 22:13-18.) It accurately predicts advanced fibrosis, because it is "geared towards identifying cirrhosis," but it is less effective at lower levels of fibrosis. (Dkt 173-3, p. 12; Vuppalanchi Dep. 22:15-24.)

41. An APRI score above 2 indicates that an offender may have cirrhosis, but this must be verified through additional testing. (Dkt 173-4, p. 23; Liangpunsakul Dep. 28:13-24.) An APRI score between 1 and 2 means there may or may not be advanced liver disease. (Dkt 173-4, pp. 24-25; Liangpunsakul Dep. 29:20-30:1; 30:16-18.) Below 1 means no advanced liver disease. (Dkt 173-4, p. 25; Liangpunsakul Dep. 30:19-21.)

### C.  Treatment of HCV

42. Treatment for patients with Hepatitis C includes monitoring, patient education, evaluation by clinicians, and laboratory analysis. (Dkt 173-2, p. 123; Fisher Dep. 203:14-22.)

43. Use of a DAA to treat chronic HCV is not appropriate in all circumstances because of contraindications, or other reasons, why it should not be utilized. (Dkt 173-2, pp. 123-124; Fisher Dep. 203:23-204:3.) Those additional factors can include: allergic reactions, pregnancy, patients who could not complete treatment before their release date, patients with a life expectancy of less than 18 months, compliance, IV drug and alcohol use, and tattoos. (Dkt 173-2, pp; 124-125; Fisher Dep. 204:4-10, 204:18-25, 205:22-206:13.)

44. Per FDA guidance, a sustained virological response (SVR) 12, or negative viral load twelve weeks after completion of treatment, is considered cured. (Dkt 173-3, p. 19; Vuppalanchi Dep. 29:3-10.)

45. A patient can relapse within 12 weeks of treatment, but evidence shows that patients will not reactivate if SVR12 is achieved. (Dkt 173-3, p. 18; Vuppalanchi Dep. 28:11-25.)

46. SVR12 does not prevent a patient from reacquiring Hepatitis C from a reexposure to the disease. (Dkt 173-3, p. 19; Vuppalanchi Dep. 29:3-11.)

47. Dr. Vuppalanchi considers treatment with a DAA for all patients who have no contraindications, including drug and alcohol use, no concerns about noncompliance, and no high risk behavior. (Dkt 173-3, p. 21; Vuppalanchi Dep. 31:13-25.)

48. Dr. Vuppalanchi would not prescribe the drug for someone who actively uses drugs because of the risk of reexposure, and the waste of effort and money. (Dkt 173-3, p. 22; Vuppalanchi Dep. 32:2-5.)

49. Dr. Vuppalanchi might not prescribe the drug if "the patient has poor prognosis and benefit is not there," including situations with advanced cancer or where the patient is dying of other organ failure where a cure of HCV would not be of clinical benefit. (Dkt 173-3, p. 22; Vuppalanchi Dep. 32:6-12.)

50. Dr. Vuppalanchi would not prescribe a DAA to a pregnant patient or a patient who is breastfeeding. (Dkt 173-3, p. 22; Vuppalanchi Dep. 32:13-25.) Dr. Vuppalanchi is comfortable withholding treatment during this time period. (Dkt 173-3, p. 22; Vuppalanchi Dep. 32:21-25.)

51. If a patient has Hepatitis B, that must be treated before treatment for HCV, because of the high risk of a flare-up of Hepatitis B during treatment for HCV. (Dkt 173-3, p. 23; Vuppalanchi Dep. 33:1-13.)

52. There are also drug-drug interactions which must be taken into account by the treating physician, and, although it is becoming less common, this can lead to a decision not to prescribe a DAA. (Dkt 173-3, p. 23; Vuppalanchi Dep. 33:17-34:7.)

53. When making a decision to prescribe or not to prescribe a DAA, a physician has to look at the individual patient situation. (Dkt 173-3, p. 24; Vuppalanchi Dep. 34:12-15.)

54. Failure to complete the treatment regime can lead to treatment failure. (Dkt 173-3, p. 24; Vuppalanchi Dep. 34:16-19.) It can also lead to the development of viral resistance to treatment. (Dkt 173-4, p. 28; Liangpunsakul Dep. 33:2-4.)

55. The duration of treatment with a DAA can be between 8 and 24 weeks, depending on patient factors and the treatment option selected. (Dkt 173-3, pp. 24-25; Vuppalanchi Dep. 34:20-35:3.)

56. Treatment-experienced patients must also undergo resistance testing to ensure that the second round of treatment is not using the same class of medication. (Dkt 173-4, pp. 28-29; Liangpunsakul Dep. 33:23-34:3.)

57. Although prior generations of DAAs were less effective on patients with more fibrosis, newer generations, combined with longer durations of treatment, have overcome that problem. (Dkt 173-3, pp. 26-27; Vuppalanchi Dep. 36:22-37:6.)

58. Dr.Vuppalanchi did not identify any other differences in outcomes from waiting to initiate treatment. (Dkt 173-3, p. 27; Vuppalanchi Dep. 37:7-11.)

59. Successful treatment with a DAA does not prevent a patient from reacquiring HCV due to a new exposure. (Dkt 173-3, p. 28; Vuppalanchi Dep. 38:4-8.)

60. Although Dr. Vuppalanchi believes the standard of care requires treatment of HCV with a DAA, when applied to an individual patient, Dr. Vuppalanchi believes there should be an "intent to treat," but if contraindications prohibit treatment, it is not required. (Dkt 173-3, p. 30; Vuppalanchi Dep. 40:19-41-6.) This is based on the proposition that "it's a curable disease and there is a cure." (Dkt 173-3, p. 31; Vuppalanchi Dep. 41:4-6.)

61. Treatment with a DAA, if SVR12 is achieved, "not only reduce[s], but even revere[s] the fibrosis" in a patient. (Dkt 173-3, p. 37; Vuppalanchi Dep. 47:5-8.)

62. If a patient is on Medicaid or Medicare and they engage in high risk behavior, Dr. Vuppalanchi would not want to treat them with a DAA, because the treatment and taxpayer money would be wasted if they were re-exposed to the disease. (Dkt 173-3, p. 39; Vuppalanchi Dep. 49:2-9.)

63. Dr. Vuppalanchi does not have experience practicing in the correctional environment, or in dealing with offenders after their release from incarceration. (Dkt 173-3, pp. 39-40; Vuppalanchi Dep. 49:10-12; 49:25-50:3.)

64. Dr. Vuppalanchi has had patients now or in the past that, for one reason or another, have not received DAAs. (Dkt 173-3, p. 42; Vuppalanchi Dep. 52:21-25.) These reasons include a failure to receive insurance approval, or because he is withholding the medication due to the patient's high risk behaviors. (Dkt 173-3, p. 42; Vuppalanchi Dep. 52:17-22.)

65. Dr. Vuppalanchi believes that the standard of care has been met for patients who have not received a DAA, but for whom he has an intent to treat. (Dkt 173-3, p. 42; Vuppalanchi Dep. 52:23-53:4.) Dr. Liangpunsakul uses a similar language of an "intent to treat" while

waiting for the "right timing" to initiate treatment. (Dkt 173-4, p. 26; Liangpunsakul Dep. 31:5-11.)

66. Dr. Vuppalanchi bases his opinion on the AASLD guidance, which acknowledges prioritization of treatment in some environments. (Dkt 173-3, pp. 46-47; Vuppalanchi Dep. 56:23-57:15.)

67. "If a physician or a group or a hospital or a medical organization is prioritizing which patients to treat first, because of a number of factors," Dr. Vuppalanchi believes that would be okay, as long as they abide by the entire AASLD guidance. (Dkt 173-3, p. 46; Vuppalanchi Dep. 56:8-15.)

68. Dr. Vuppalanchi believes that he is providing effective treatment to his patients for whom he has not prescribed a DAA, by providing them counseling to preserve their liver health and to improve their behavior so he can initiate treatment at a later date. (Dkt 173-3, p. 52-53; Vuppalanchi Dep. 62:22-63:4.)

69. The "substantial likelihood" of harm identified by Dr. Vuppalanchi in his report, concerns complications that are primarily related to cirrhosis. (Dkt 173-3, p. 55; Vuppalanchi Dep. 65:8-23.)

70. Plaintiffs' other expert, Dr. Liangpunsakul is part of the Hepatitis C innovative team at the Veteran's Administration Hospital, which consists of two treating physicians and three pharmacists. (Dkt 173-4, p. 7; Liangpunsakul Dep. 12:16-24.) The VA team has treated 400 or 500 DAA patients in the last two years. (Dkt 173-4, p. 8; Liangpunsakul Dep. 13:1-12.)

71. Each patient at the VA is evaluated comprehensively to confirm they are appropriate candidates for treatment. (Dkt 173-4, p. 8; Liangpunsakul Dep. 13:14-25.) The team looks

to see whether the patient has a positive HCV viral load, no life-threatening conditions, no drug and alcohol use (which is a contraindication but was, at one time, an absolute contraindication to treatment). (Dkt 173-4, pp. 8-9; Liangpunsakul Dep. 13:24-14:11.) The team prescribes DAAs to "almost all" patients who do not fit into any contraindication for treatment. (Dkt 173-4, p. 9; Liangpunsakul Dep. 14:13-15.) The VA employs a "hierarchy of when to treat and not to treat" patients who use drugs or alcohol. (Dkt 173-4, p. 10; Liangpunsakul Dep. 15:12-21.)

72. Although the VA HCV team has a "subset of patients that the history is clean" who are compliant, who are "straightforward case[s]" for treatment, the team discusses other individual cases at monthly meetings. (Dkt 173-4, pp. 11-12; Liangpunsakul Dep. 16:11-17:7.) The decision of if and when to treat is made by the team as a whole. (Dkt 173-4, p. 12; Liangpunsakul Dep. 17:9-15.) The team does decide "not to initiate" treatment, but to follow a patient "down the road" to see "if the patients…become[s] eligible" for treatment. (Dkt 173-4, p. 12; Liangpunsakul Dep. 17:16-20.)

73. Dr. Liangpunsukul does not believe that it is a violation of the standard of care not to prescribe a DAA to every patient with HCV. (Dkt 173-4, p. 14; Liangpunsakul Dep. 19:22-25.)

74. Dr. Liangpunsukul does not believe there is sufficient data to show that every patient with HCV will ultimately develop cirrhosis, but "[i]f the patient lives 50, 60 years, [with HCV] one point down the road they will develop complications." (Dkt 173-4, p. 16; Liangpunsakul Dep. 21:3-10.)

75. Although the data shows that there is a twenty-percent chance of development of cirrhosis within 20 years for patients with HCV, it does not permit individualized analysis to show

how HCV will progress in an individual patient, but certain risk factors can be analyzed. (Dkt 173-4, pp. 17-18; Liangpunsakul Dep. 22:23-23:10; 23:15-25.)

76. Dr. Liangpunsakul advocates treatment, but acknowledges there is no medical harm to waiting a year to initiate treatment. (Dkt 173-4, p. 33; Liangpunsakul Dep. 38:24-25.) There might not be harm in two years, but Dr. Liangpunsakul would feel pressured to explain to his patient why he was not prescribing treatment sooner. (Dkt 173-4, p. 34; Liangpunsakul Dep. 39:2-19.) Prior to the advent of DAAs, patients would wait five or six years for treatment without any adverse consequence. (Dkt 173-4, p. 34; Liangpunsakul Dep. 39:20-24.)

77. Dr. Liangpunsakul is not aware of any differences in outcomes for patients treated with or without advanced fibrosis with the new generation of DAAs. (Dkt 173-4, pp. 35-36; Liangpunsakul Dep. 40:21-41:8.) Even patients treated at Fibrosis stages 3 and 4 have quite comparable outcomes with the new DAAs. (Dkt 173-4, p. 36; Liangpunsakul Dep. 41:9-15.)

78. It is Dr. Liangpunsakul's opinion that all patients who have HCV "should be strongly considered [for treatment with a DAA] once a diagnosis is made," but "not all the hep C infected patients should get the treatment initiated right away." (Dkt 173-4, p. 40; Liangpunsakul Dep. 45:24-7.)

**D. Health Care Services Directive 3.09**

79. IDOC's policy for management of offenders with HCV is found in Health Care Services Directive 3.09: Management of Hepatitis C. (Dkt 173-1, p. 53; Van Ness Dep. 81:5-13.)

80. The Health Care Services Directive ("HCSD") was last updated by IDOC's Chief Medical Officer, Dr. Van Ness in 2017. (Dkt 173-1, pp. 5, 6, 7; Van Ness Dep. 8: 24-25, 9:4-9, 10:2-11; dkt. 173-8, p. 1.)

81. Dr. Van Ness reviewed the AASLD guidance and Federal Bureau of Prisons' guidelines during the process of updating 3.09. (Dkt 173-1, pp. 6-7; Van Ness Dep. 9:4-10:8) Dr. Van Ness "wanted to look at…what was current and look at other recommendations" before he decided on what he thought was the best approach to HCV. (Dkt 173-1, p. 7; Van Ness Dep 10:4-8.)

82. Dr. Van Ness chose to adopt the FBOP guidelines for HCV because the FBOP approach "made sense to [him]" in that "it was about the individual, about understanding the individual from a medical standard, having a good baseline, and then treating them as individuals based on all the parameters that go into their care. Everybody's different." (Dkt 173-1, pp. 27-28; Van Ness Dep. 32:20-33:10.)

83. The HCSD is drafted by IDOC's Chief Medical Officer, but ultimately approved by the Commissioner of the Indiana Department of Correction. (Dkt 173-1, p. 54; Van Ness Dep 82:11-15.)

84. Of patients with chronic HCV, "10 to 20 percent over 20 to 30 years may well develop cirrhosis, and so, again, the other's don't. They get no sequelae and may die of a heart attack or a stroke or something else over 20 or 30 years and not develop any cirrhosis. So, in my mind the key is to be able to evaluate the patient to know when to intervene with treatment, not to treat everybody, but to intervene at the appropriate time." (Dkt 173-1, p. 30; Van Ness Dep 35:14-23.)

85. The APRI score is used to track who needs further evaluation. (Dkt 173-1, p. 43; Van Ness Dep 71:13-15.)

86. After the APRI score, the offender receives a physical exam and any other lab work ordered by the Wexford physicians. (Dkt 173-1, p. 48; Van Ness Dep 76:12-17.) This is so the physicians can "look at the whole patient, [the] whole lab profile, [the] whole physical exam," and it can all be put together. (Dkt 173-1, p. 49; Van Ness Dep 77:18-21.)

87. After a brief explanation of HCV, the directive has seven primary components:

   a. All incoming and returning offenders shall be screened for the presence of the HCV antibody;

   b. All offenders diagnosed with HCV shall receive a baseline clinical evaluation within 90 days;

   c. All offenders diagnosed with HCV shall be counseled regarding HCV;

   d. All offenders diagnosed with HCV shall be offered certain vaccinations unless otherwise directed by the attending physician;

   e. All offenders diagnosed with HCV shall be managed in accordance with the Federal Bureau of Prison's policy "Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection; and,

   f. Finally, offenders diagnosed with HCV who have end stage liver disease secondary to HCV shall be provided off-site consultation with either a hepatologist or a GI specialist for treatment recommendations.

(dkt. 173-8, pp. 2-3.)

88. The guidelines are guidelines. "There's nothing cast in granite, so these are all guidelines." It's "about individual therapy, treatment, understanding the person and knowing when to intervene." (Dkt 173-1, pp. 89-90; Van Ness Dep. 117:18-118:2.)

**E. Federal Bureau of Prison's Clinical Guidance for the "Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection"**

89. The May 2017 Federal Bureau of Prison's Clinical Guidance for Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection provides that "[p]roper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are patient-specific." (Dkt 173-9, p. 1; FBOP Guidance 2017, cover sheet.)

90. The BOP Guidance constitutes "the most current BOP recommendations for the treatment of chronic HCV infection in the federal inmate population." (Dkt 173-9, p. 6; FBOP Guidance 2017, p. 1.)

91. The BOP Guidance recommends review of the AASLD recommendations, and notes that BOP Central Office Medical staff "will continue to monitor this guidance and provide updates as necessary." (Dkt 173-9, p. 6; FBOP Guidance 2017, p. 1.)

92. The BOP Guidance provides step criteria for evaluating federal offenders with Hepatitis C similar to those set forth in HCSD 3.09:

> g.  Step 1: Test for HCV Infection;
>
> h.  Step 2: Perform a baseline evaluation of all inmates who are anti-HCV positive;
>
> i.  Step 3: Assess for hepatic cirrhosis/compensation *and* BOP priority criteria for treatment if HCV RNA is detectable;
>
> j.  Step 4: Perform a pretreatment assessment, if priority criteria for treatment are met; and,

k.   Step 5: Monitor patient during and after treatment.

(Dkt 173-9, p. 6; FBOP Guidance 2017, p. 1.)

93. The FBOP guidance provides criteria for evaluating priority of treatment because, "[a]lthough all patients with chronic HCV infection may benefit from treatment, certain cases are at higher risk for complications or disease progression and require more urgent consideration for treatment." (Dkt 173-9, p. 12; FBOP Guidance 2017, p. 7.)

94. The FBOP guidance establishes three priority levels for treatment:

l.   Priority level 1 – High Priority for Treatment consisting of offenders who have or are: advanced hepatic fibrosis; APRI score greater than 2; known or suspected cirrhosis; post-liver transplant; hepatocellular carcinoma; certain comorbid conditions; taking immunosuppressant medications for a comorbid condition; or to ensure continuity of care if a newly incarcerated offender was already started on a pharmaceutical treatment;

m.   Priority Level 2 – Intermediate Priority for Treatment consisting of offenders who have or are: evidence for progressive fibrosis; APRI score greater than 1; certain comorbid conditions associated with more rapid progression of fibrosis; and chronic kidney disease;

n.   Priority Level 3 – Low Priority for Treatment consisting of offenders who have or are: stage 0 to stage 1 fibrosis on a liver biopsy; APRI score less than one; and all other cases meeting the eligibility requirements listed in Fact 11.

(Dkt 173-9, p. 13; FBOP Guidance 2017, p. 8.)

95. The BOP Guidance further provides that "exceptions to the above criteria for Priority Levels 1-3 will be made on an individual basis and will be determined primarily by a compelling or urgent need for treatment, such as evidence for rapid progression of fibrosis, or deteriorating health status from other comorbidities. (Dkt 173-9, p. 13; FBOP Guidance 2017, p. 8.)

96. The BOP Guidance establishes additional criteria for treatment, including:

18

    o.  No contraindications to, or significant drug interactions with, any component of the treatment regime;

    p.  Not be pregnant, especially for any regimen that would require ribavirin or interferon;

    q.  Have sufficient time remaining on their sentence in the BOP to complete a course of treatment;

    r.  Have a life expectancy greater than 18 months; and,

    s.  Demonstrate a willingness and ability to adhere to a rigorous treatment regime and to abstain from high-risk activities while incarcerated.

(Dkt 173-9, p. 14; FBOP Guidance 2017, p. 9.)

97. The BOP Guidance was updated again in January 2018, but the only substantive change was to change the APRI score criteria for priority levels 2 and 3 from an APRI score of 1 to an APRI score of .7. (Dkt 173-10, pp. 2, 13; FBOP Guidance 2017, pp. *i*, 9.)

98. The BOP Guidance continues to evolve – it has shifted from four priority levels to three and made other adjustments, including reducing the priority given to HIV positive co-infections. (Dkt 173-2, pp. 129-130; Fisher Dep. 209:21-210:4.)

99. Prioritization of treatment for offenders with Hepatitis C is typically followed in the world of corrections.  (Dkt 173-2, p. 143; Fisher Dep. 227:10-14.)

**F. Practices of IDOC's Medical Vendor**

100. IDOC's Medical Vendor, Wexford's, goal is to follow IDOC's policy, which requires that treatment of offenders with HCV be managed in accordance with the FBOP guidance. (Dkt 173-2, p. 9; Fisher Dep. 25:19-24) To meet this goal, Wexford educates its clinicians, doctors, nurse practitioners, and physician assistants on the IDOC policy and FBOP

guidelines. (Dkt 173-2, p. 10; Fisher Dep. 26:3-10.) However, "clinical decisions are individual decisions made by individual providers." (Dkt 173-2, p. 9; Fisher Dep. 25:19-24)

101. The AASLD guideline is "basically saying that all individuals should be treated [with DAAs] except for small" exceptions. (Dkt 173-2, p. 32; Fisher Dep. 81:12-16.) However, "[t]here are always individual circumstances where a treatment guideline, which is meant to give guidance, may not be applicable to an individual patient." (Dkt 173-2, pp. 26-27; Fisher Dep. 75:23-76:1.)

102. Likewise, the "[s]tandard of care is standard of care, and it should apply to different environments," but "[t]here may be different influences of why the care would be different in a different environment." (Dkt 173-2, p. 49; Fisher Dep. 99:16-20.) "[E]ach individual case is different. So guidelines guide general treatment, they don't guide the course for any one individual." (Dkt 173-2, p. 50; Fisher Dep. 100:1-3.) "You don't treat according to what a guideline says. You treat…according to what the individual's circumstance is." "It's individual clinical decisions." (Dkt 173-2, p. 50; Fisher Dep. 100:6-9.) Because, "[e]very patient case is unique and different, and that's part of the considerations of the FBOP guidance that each case is unique." (Dkt 173-2, p. 135; Fisher Dep. 215:1-6.)

103. The AASLD and FBOP are among many guidelines regarding the treatment of HCV. There are also guidelines from the European Association of the Study of Liver Disease, the World Health Organization, and others. (Dkt 173-2, p. 44; Fisher Dep. 94:9-18.) Each guideline views HCV "a little bit differently" as, "[w]henever you get a committee together, they will look at the data somewhat differently and may come up with a different guideline based on it." (Dkt 173-2, p. 44; Fisher Dep. 94:19-23.)

104. Dr. Fisher is not aware of any state that is following AASLD guidance without a level of prioritization. (Dkt 173-2, p. 143; Fisher Dep. 227:15-23.)

105. Fisher would not recommend a blanket policy of treating all offenders who have chronic Hepatitis C, except those excluded from the AASLD guidance, because "each individual case is different" and there may be other issues with therapy. (Dkt 173-2, p. 54; Fisher Dep. 104: 9-24.)

106. Wexford chose not to distribute their corporate-wide medical policies in Indiana, because "Indiana policies are quite strong." (Dkt 173-2, p. 119; Fisher Dep. 199:3-10.)

107. In evaluating the standard of care, a consideration is what the community is actually doing, which would include reviewing prioritization criteria used nationwide. (Dkt 173-2, pp. 145-146; Fisher Dep. 229:13-230:3.) Prioritizing treatment based on APRI score is used nationwide and has not been developed solely by Indiana. (Dkt 173-2, p. 146; Fisher Dep. 230:4-9.)

108. Dr. Fisher believes that the standards and procedures currently in place in Indiana are consistent with the applicable standard of care, based upon HCSD 3.09 and the prioritization guidance from the Federal Bureau of Prisons. (Dkt 173-2, p. 136; Fisher Dep. 216:1-9.)

109. All offenders in IDOC identified as HCV antibody positive are "being treated by being seen regularly, chronic care clinics, having blood work monitored, being educated about their disease, and some are treated with direct acting antivirals. (Dkt 173-2, pp. 31-32; Fisher Dep. 80:18-81:1.)

110. Chronic HCV is influenced by both static and modifiable factors, which permit the disease to be managed by changes in patient behavior through monitoring and counseling. (Dkt

173-2, pp. 82-83; Fisher Dep. 144:23-145:15.) Monitoring, patient education, and discussion of risk strategies are all treatment for HCV. (Dkt 173-2, p. 37; Fisher Dep. 86:12-18.) Although they counsel incarcerated offenders against IV drug use and prison tattoos to avoid spreading HCV, those activities still go on in the prison environment. (Dkt 173-2, p. 63; Fisher Dep. 113:12-20.) Moreover, these behaviors during or after prison can lead to reinfection. (Dkt 173-2, p. 90; Fisher Dep. 155:2-8.) Wexford physicians also perform routine ultrasounds for individuals with cirrhosis every six months. (Dkt 173-2, p. 22; Fisher Dep. 71:1-8.)

111. Wexford requires prior approval for DAAs for HCV positive offenders, and a review process takes place that includes discussions with the provider who believed the patient may need a DAA. (Dkt 173-2, p. 50; Fisher Dep. 100:20-25.) Even someone with an APRI score of .5 would not be automatically excluded from treatment, as there are reasons to consider treatment for any individual. (Dkt 173-2, p. 51; Fisher Dep. 101:1-4.)

112. Wexford employs a two-step process to determine when treatment with a DAA is appropriate. A provider at a facility makes a determination that a person meets the priority level of the FBOP and refers the patient for treatment. The patient is then reviewed by another Wexford physician, Dr. Dina Paul, who reviews the lab work, treatment prioritization guidelines, and "help[s] to determine whether this is an appropriate candidate for therapy following FBOP guidance." There is a secondary process where Dr. Paul or Dr. Kinsley also independently review offender APRI scores and determine whether the facility clinician needs to do additional testing to determine whether the offender is a candidate for treatment. (Dkt 173-2, pp. 104-105; Fisher Dep. 184:23-185:16.)

113. The decision to treat is ultimately a clinical decision made by Wexford's physicians. (Dkt 173-2, pp. 105-106; Fisher Dep. 185:23-186:14.)

114. Dr. Fisher cannot opine as to whether the care received by an individual was appropriate or not without having reviewed the case. (Dkt 173-2, p. 135; Fisher Dep. 215:4-6.)

**II.  Statement of Material Facts in Dispute**

Whether the standard of care requires all individuals, except those with short life spans that cannot be remediated through direct-acting antiviral treatment, to be immediately treated with a direct-acting antiviral. [Facts 42-78.]

**III. Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move for summary judgment if he can demonstrate to the court that there is no genuine issue of material fact and that the moving party is entitled to judgment in his favor as a matter of law. Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Only material facts in dispute deter summary judgment; those which are irrelevant or unnecessary do not. *See Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1103 (7th Cir. 2008) citing *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to his case, on which he would bear the burden of proof at trial,

summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7ᵗʰ Cir. 1996), *cert. denied*.

"As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney,* 526 F.3d at 1103(citations omitted). The substantive law underlying the claim defines which facts are material, and the Court should only refrain from granting the motion when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986).

For purposes of cross-motions for summary judgment, while Defendants need only show "an absence of evidence to support *any* essential element of" Plaintiffs' case, Plaintiffs "must establish all the essential elements of [their] claim." *Cargill Meat Solutions Corp. v. Freezer Refrigerated Storage, Inc.*, 2013 WL 4854419 at *3 (S.D. Ill. Sept. 11, 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (further citations omitted).

## IV. <u>Argument</u>

The undisputed material facts establish that the Court should deny Plaintiffs' motion for summary judgment and grant the Defendants' cross-motion. Although they argue the general proposition that the standard of care requires treatment of all persons with HCV, in fact, that general proposition is subject to considerable limitations and exclusions. Indeed, Plaintiffs' own experts acknowledge that treatment decisions must be made on an individualized basis where individual patient criteria (and even non-clinical behaviors) must be taken into account before the decision to initiate treatment is made and that treatment is not appropriate for every patient.

Plaintiffs offer absolutely no evidence to show that immediate treatment is necessary for any offender not currently receiving it.

Moreover, IDOC's policies create general criteria, but do not dictate treatment outcomes for any individual offender. Instead, clinical decision-making is made by the treating physicians employed by the medical vendor, Wexford. It is well-established law that it is not deliberately indifferent to place treatment decisions into the hands of the clinicians best-equipped to make healthcare decisions. Further, because the policy provides general criteria, but does not dictate treatment, and because some, but not all offenders are receiving DAAs, Plaintiffs cannot show that they have been discriminated against by virtue of their Hepatitis C and summary judgment on the ADA and Rehabilitation Act should be entered, too.

Although Plaintiffs have sued Commissioner Carter, Dr. Van Ness, and Monica Gipson in their official capacities, the undisputed facts show that, while Monica Gipson may assist in drafting healthcare service directive, and Dr. Van Ness makes the final policy recommendation, Commissioner Carter is the final authority for all policies, including Health Care Service Directives, in the Indiana Department of Correction. [Fact 83.] Accordingly, Dr. Van Ness and Monica Gipson, in their official capacities, should be granted summary judgment on all claims, because they can recommend, but cannot order the relief Plaintiffs seek.

1. **Defendants are not deliberately indifferent to offenders' serious medical needs.**

Plaintiffs allege that the policy of the IDOC for management of offenders with chronic Hepatitis C is deliberately indifferent to their serious medical needs. Plaintiffs' argument can be summarized as the proposition that the standard of care requires an immediate prescription of a DAA to all offenders who have been diagnosed with chronic HCV. However, even assuming the standard of care mandated prescription to all persons, which the undisputed facts show that it does

not, Plaintiffs' claims are governed by the standard for deliberate indifference to a serious medical need under the Eighth Amendment and not by state law medical malpractice principles. Plaintiffs cannot show that the Defendants, by drafting a policy that prioritizes treatment, but expressly authorizes the medical practitioners to exercise their professional medical judgment as to the individualized circumstances of their patients, are deliberately indifferent to their serious medical needs. Further, they cannot show that applying prioritization criteria and evaluating offenders on an individual basis for treatment strays so far outside the bounds of professional medical judgment that "no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894-895 (7th Cir. 2008).

Deliberate indifference is a subjective standard. *Arnett v. Webster*, 658 F.3d 742, 750-751 (7th Cir. 2011). To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind, something akin to recklessness." *Id.* "A prison official acts with a sufficiently culpable state of mind when he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Id.* Deliberate indifference is more than negligence and approaches intentional wrongdoing. *Id.*

Claims by offenders alleging deliberate indifference to a serious medical need by correctional staff are analyzed under two different standards. Non-medical defendants can generally rely on the expertise of medical personnel. *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016). As the Seventh Circuit explained, this proposition "follows naturally from the division of labor within a prison." *Id.* (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004). "Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on." *Id.* "Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor." *Id.* The

exception to this rule is that non-medical defendants may be held liable where they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* But, in *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005), the Court noted that it could "see no deliberate indifference" where an offender's complaints were referred to medical providers who could be expected to address an offender's health concerns. Further, mere negligence in failing to detect and prevent misconduct is not sufficient to show deliberate indifference. *Chatham*, 839 F.3d at 684. As *Arnett* also shows, a claim that an offender is not receiving the specific medication that he seeks, when he is not otherwise being ignored by medical staff, does not state a claim for deliberate indifference. *Arnett*, 658 F.3d at 754 (citing *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

The decision-making of medical professional, however, is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Id.* In practice, this requires a showing that the decision of the medical profession may be found to be deliberately indifferent "only if the decision of the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* In addition, "deliberate indifference claims based on medical treatment require reference to the *particularized circumstances* of individual inmates." *Roe v. Elyea*, 631 F.3d 843, 859-860 (7th Cir. 2011). In *Roe*, the Court looked to two Third Circuit cases for guidance on this issue. *Id.* In *Rouse v. Plantier*, 182 F.3d 192, 199 (3rd Cir. 1999) a class action was remanded to the district court for subclassification among a "medically diverse group" of individuals with different stages of diabetes, because alleged violations of the Eighth Amendment "obviously var[y] depending on the medical needs of the particular prisoner." Similarly, a blanket policy that denies elective abortions

and fails to consider factors relevant to each particular offender denies the type of "individualized" treatment associated with the provision of adequate medical care. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 & n. 32 (3rd Cir. 1987). In *Roe*, the Seventh Circuit went on the explain that offender medical decisions must be fact-based with respect to the particular offender, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments. *Id.*

Nevertheless, "the necessity of individualized treatment does *not* mean that the use of treatment protocols and guidelines is generally unconstitutional. Indeed, in the ordinary course, such standard practice implement professional discipline that in turn facilitates appropriate and quality care within large and administratively complex institutional settings, including correctional settings." *Id.* at 860 (emphasis original). "In the prison context…such protocols must ensure that prison officials fulfill their responsibility to provide constitutionally adequate care to each individual inmate with reference to his particularized medical need." *Id.*

What is more, "'deliberate indifference' is a robust state-of-mind requirement, ensuring that 'the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.'" *Ortiz v. Webster*, 655 F.3d 731, 736 (7th Cir. 2011) (quoting *Peate v. McCann*, 294 F. 3d 879, 882 (7th Cir. 2002)). "Mere negligence, or even gross negligence [does] not suffice." *Porter v. Suliene*, 391 F. App'x 565, 567-568 (7th Cir. 2010) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-106 (1976). Nor does a disagreement among medical professionals, or choosing one treatment recommendation over another amount to deliberate indifference, where both recommendations are made by qualified medical professionals. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014) (citing *Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). Nor does every refusal of medical treatment constitute deliberate indifference. *See*

*Ralston v. McGovern*, 167 F.3d 1160, 1161-1162 (7th Cir. 1999). It is well-established that "[a] prison is not required by the Eighth Amendment to give a prisoner medical care that is as good as he would receive if he were a free person, let alone an affluent free person." *Maggert v. Hanks*, 131 F.3d 670, 671-672 (7th Cir. 1997). "He is entitled only to minimum care." *Id.*

Further, the Eighth Amendment does not provide a claim for specific treatment. *Forbes v. Edgar*, 112 F.3d 262, 266-267 (7th Cir. 1997). And, with regard to HCV specifically, at least one Circuit Court has recognized that the question under the Eighth Amendment is not whether HCV constitutes a "serious medical need," but whether it presents "a serious medical need for prompt…treatment." *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (also finding that treatment of HCV included monitoring labs, genotypic testing of the HCV infection, counseling, and ordering of pain medications and vitamins, authorized a biopsy, discussed further treatment, and referred Bender for review by a specialist.) With these principles on this record, Defendants are entitled to summary judgment.

The undisputed material facts show that the management of offenders with Hepatitis C is governed, from IDOC's perspective, by Health Care Services Directive 3.09, which sets out general policies for the medical vendor, Wexford of Indiana, to follow.  The directive requires the screening of all incoming offenders for HCV, and, for all of those who screen positive, the following additional steps: 1) a baseline clinical evaluation within 90 days; 2) counseling; 3) vaccinations unless otherwise directed; 4) management of the HCV in accordance with FBOP guidelines; and 5) off-site consultation for those with end-stage liver disease. [Fact 87.] The FBOP guideline further establishes prioritization of treatment according to degree of illness, but authorizes exception to the priority queue based upon an individualized determination of patient need. [Facts 94-95.]

In practice, these policies are applied by Wexford to manage the HCV positive offender population. [Fact 100.] Wexford educates its clinicians on the HCSD and FBOP guidelines, but "clinical decisions are individual decisions made by individual providers," [Fact 100], who treat according to the individualized circumstances of each patient. [Fact 102.] Moreover, like the VA, Wexford employs a multi-level process for evaluating offenders for treatment with DAAs. Patients are evaluated by a facility-level clinician who determines whether treatment with a DAA is appropriate, after which that recommendation is further reviewed by other clinicians at Wexford who determine whether treatment will be initiated. [Fact 112.] The Wexford clinicians who do the secondary review also review offender lab values to determine who may need further evaluation at the facility level. [Fact 112.] This multi-layered review to determine whether an individual offender is appropriate for treatment is not deliberately indifferent.

Although Plaintiffs argue that, with few exceptions, all offenders who have HCV should be receiving a DAA, not even their own experts testified to that proposition. Indeed, Plaintiffs' own expert testimony establishes that determining when to initiate DAA treatment for an individual patient should be an individualized determination made after reviewing an individual patient's clinical information and weighing that other behaviors and subjective criteria like an "ability to comply." [Facts 47-53.] One of Plaintiffs own experts has opined that it is not a violation of the standard of care not to prescribe a DAA to every patient. [Fact 73.] Plaintiffs' experts have also explained that patients can go up to five to six years without curative treatment without adverse consequences, but even if there were any such consequences, successful treatment with a DAA reverses the effects of fibrosis. [Facts 61, 77.] IDOC's HCSD, the FBOP guidance, and Wexford's practices all require that each offender with chronic HCV has been individually managed and treated for their HCV and an individualized determination is made to determine if and when

30

treatment with a DAA is appropriate. No offender is categorically denied treatment and Plaintiffs point to not examples of any offender who has been denied appropriate medical care. These policies and practices are not deliberately indifferent to Plaintiffs' or the class's medical needs.

As Plaintiffs cannot show that the policies or practices of the IDOC or Wexford are deliberately indifferent to their serious medical needs, summary judgment should be entered for the Defendants. But, going further, Plaintiffs have not and cannot show that they or any member of the class is not receiving adequate medical treatment. General arguments that medical care is inadequate, or even a general argument that every offender with HCV should be treated with a DAA (especially where, as here, the evidence establishes that even the recommendations upon which Plaintiffs rely for the proposition that all patients with HCV should receive a DAA is subject to numerous individualized exceptions), is not sufficient to show deliberate indifference to a serious medical need. *See Porter v. Suliene*, 391 F. App'x 565, 567-568 (7th Cir. 2010). In *Porter*, the Seventh Circuit held that no reasonable jury could conclude that a physician who chose a particular course of treatment was deliberately indifferent to an offender's health needs where the doctor testified the treatment was unnecessary and plaintiff designated no alternative evidence. *Id.* Plaintiffs offer only general conclusory arguments that they, and the class, should all immediately receive DAAs (again, ignoring their own expert's testimony that individualized circumstances and behaviors must be considered), but Plaintiffs fail to provide any evidence that their own or any member of the class's healthcare has been inadequate or that any alleged inadequacy is the consequence of HCSD 3.09. Indeed, while Plaintiffs have designated two experts who have testified generally regarding HCV and the considerations for treatment with a DAA, neither expert offers any opinion on the healthcare received by the named plaintiffs or by any other individual offender in IDOC. The undisputed facts, and Plaintiffs' expert testimony, establish that treatment

31

decisions are individualized, [Facts 53, 78], and they offer no evidence that they, or any offender, has individually received inadequate health care. Nor is there evidence that any such deficiency is caused by HCSD 3.09. Without any such evidence, Plaintiffs cannot meet the essential elements of their claim, and the Court should enter summary judgment for the Defendants.

Plaintiffs also speculate that the cost of DAAs is the biggest driver of IDOC and Wexford policies. [dkt. 167, p. 25.] Therefore, because deliberate indifference may be found where cost is considered "to the exclusion of reasonable medical judgment," [dkt. 167, p. 25 (citing *Johnson v. Doughty*, 433 F.3d 1001, 1003 (7th Cir. 2006)], Plaintiffs argue the Defendants have displayed deliberate indifference to their serious medical needs. This argument never leaves the ground.

However, Plaintiffs offer no evidence that cost played any role in determining IDOC policies, but merely speculate that it did because of the exorbitant cost of HCV medications. Nor is there any evidence to offer, as the undisputed material facts establish that cost was not the deciding factor in determining IDOC policy. [Fact 11.] Instead, Dr. Van Ness recommended a policy based upon his determination of what was the best approach to addressing HCV in the offender population. [Fact 81.] Although IDOC's request for proposal and the contract with Wexford requires an annual budget line-item of $1.5 million for purchase of pharmaceuticals to treat offenders with HCV, this was done so that companies could not deliberately underbid by failing to account for the costs of HCV in their proposed budgets. [Fact 17.] Moreover, $1.5 million is a "significant amount in any pharmacy budget." [Fact 17.] Although Plaintiffs posit that a $1.5 million "cap" on HCV spending must be deliberately indifferent, that argument fails for two reasons. First, the $1.5 million is a budgetary line-item subject to revision or supplementation upon request from the medical vendor and approval by the Chief Medical Officer, and second, Wexford has not requested additional funds from IDOC to cover HCV treatment. [Facts 15-16.] Plaintiffs

make no showing that, after an individualized determination of offender needs, and factoring in the turnover in the offender population each year, $1.5 million is not adequate to cover the costs of DAAs for each offender who has a serious medical need for treatment with a DAA. Having not shown that, Plaintiffs cannot show that specifically requiring $1.5 million be budgeting toward HCV is deliberately indifferent to offender health needs. Out of the multitude of health conditions that an offender population of over 25,000 experiences each year, specifically identifying HCV as an issue of concern meriting special attention in the medical vendor contract shows the opposite of deliberate indifference. Even if the $1.5 million budget line-item for HCV pharmaceuticals is inadequate, it shows that, rather than ignoring the problem or leaving it entirely to the medical vendor, IDOC is taking specific action to address the HCV population in conjunction with its medical vendor. That is not deliberate indifference.

The undisputed material facts show that treatment of HCV with a DAA is appropriate in some, but not all, persons who have chronic HCV. Even Plaintiffs' experts acknowledge that individualized decision-making is required, because deciding if and when to treat requires an evaluation of a patient's clinical values as well as subjective determinations of their behaviors and attributes. IDOC, through HCSD 3.09, and Wexford through its practices in the IDOC, account for this by screening offenders for HCV and providing individualized medical treatment, including the use of DAAs, where appropriate. Neither the policy nor the practice is deliberately indifferent to the serious medical needs of Plaintiffs or the class, and the Court should enter summary judgment for the Defendants and deny Plaintiffs' motion.

## 2. Health Care Services Directive 3.09 does not deny medical care to offenders in violation of the ADA or Rehabilitation Act.

Defendants are entitled to judgment as a matter of law on Plaintiffs' ADA and Rehabilitation Act claims. Both the ADA and the Rehabilitation Act prohibit discrimination against an individual

with a disability. Relief under these statutes "is coextensive" and "the analysis governing each statute is the same," except that the Rehabilitation Act includes an additional element of receipt of federal funds. *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671 (7th Cir. 2012). Given that a plaintiff can have but one recovery, the Seventh Circuit has previously found it prudent to examine both under a Rehabilitation Act analysis. *Id.* at 672.

To state a claim under the Rehabilitation Act, a plaintiff must show that (1) he is a qualified person; (2) with a disability; and, (3) the defendant denied him access to a program or activity because of his disability. *Id.* (citations omitted). However, "a prison official does not violate the ADA when failing 'to attend to the medical needs of…disabled persons." *Resel v. Fox*, 26 Fed.Appx. 572, 577 (7th Cir. 2001) (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)). "A claim for inadequate medical treatment is improper under the ADA." *Id*. Indeed, as the Court explained in its order denying co-defendant Wexford of Indiana's motion to dismiss, "the ADA is not applicable to complaints relating to the quality of care received, for those complaints may be addressed under a medical malpractice or an Eighth Amendment claim." [dkt. 103, p. 6.]

In *Resel*, the Seventh Circuit considered a claim by an offender who required a colonoscopy due to post-operative rectal bleeding from a pre-incarceration procedure. *Id.* at 574. Resel received prompt care, but some two months later reported to a jail employee that the stiches from his surgery had opened up. *Id.* A nurse left instructions that he should see a doctor, but if the condition did not resolve or if it became painful, it would require immediate attention and possibly surgery. *Id.* Resel saw a doctor the next morning. *Id.* Beginning five days later, Resel began requesting to see a doctor again, but he was not seen by healthcare staff for another twenty-three days. *Id.* The apparent outcome from that visit was a recommendation for surgery, but Resel was released from the jail before surgery took place. *Id.* at 575. Resel filed suit alleging deprivations under the Eighth

34

Amendment, ADA, and state law torts. *Id.* The Seventh Circuit affirmed dismissal of the ADA claim reasoning that Resel had not alleged discrimination on the basis of a disability and because a claim for inadequate medical treatment is improper under the ADA. Plaintiffs' claims suffer from the same deficiency.

Assuming chronic HCV constitutes a disability under the ADA, Plaintiffs' claims still fail. First, Plaintiffs' claim fails because they cannot show that they are qualified individuals. A qualified individual is anyone with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131(2). Accordingly, (assuming Plaintiffs have stated an ADA or Rehabilitation Act claim), Plaintiffs must show that a direct-acting antiviral is an appropriate medication for each of them and for each member of the class for them to be "qualified" individuals. The undisputed facts show that these medications have contraindications that can preclude treatment and each patient must be evaluated independently prior to treatment. [Facts 48-53.] This is so because there are a multitude of factors considered by a clinician before recommending a DAA for a specific individual. Plaintiffs were determined to not be appropriate candidates for treatment with DAAs by Wexford clinicians, and they have designated no expert who can testify that each of them is an appropriate candidate for treatment with a DAA. Moreover, there is no evidence that each member of the class, all current and future offenders incarcerated in the IDOC who have chronic Hepatitis C, would meet the criteria to be appropriate candidates for treatment with a DAA. Plaintiffs are not qualified individuals and their ADA and Rehabilitation Act claims fail as a matter of law.

Assuming that Plaintiffs can show that they are qualified individuals, the undisputed facts, and Plaintiffs' own motion for summary judgment, show that they have filed suit asking this Court to order that they, and a class of all current and future incarcerated offenders with chronic HCV, be prescribed a specific class of medications to treat their hepatitis C. Those claims are not cognizable claim under the ADA or the Rehabilitation Act and Plaintiffs had uncovered no evidence showing any intent to discriminate against offenders with Hepatitis C.

Moreover, the undisputed facts show that all offenders who are identified as having chronic HCV are placed into the medical vendor's chronic care clinics where they are seen regularly by medical professionals, their labs are monitored by those professionals, and they are educated and counseled about their disease, where counseling to change high risk behaviors is a practice also employed by plaintiffs' own experts. [Facts 68, 71, 109, 100] Further, if the treating physicians determine that treatment with a DAA is appropriate for an individual offender, that offender is prescribed a DAA. [Facts 100, 109.] Each offender is evaluated on their own merits and some offenders receive a DAA and some do not. [Fact 109.] That clinical evaluation is based upon an individual patient evaluation. [Facts 111, 112.] This is not discrimination or a categorical exclusion and Plaintiffs cannot meet their burden of showing discrimination under the ADA or the Rehabilitation Act.

Indeed, the fact that all offenders receive specific care for their HCV and offenders who are individually determined to be appropriate candidates for DAAs by their medical providers receive treatment with a DAA belies any assertion that they are being denied appropriate medical care because of their HCV. Plaintiffs' claims concern the adequacy of their medical care, not a discriminatory denial of medical care. Defendants are entitled to summary judgment on these claims.

36

**V.  <u>Conclusion</u>**

For the reasons set forth above, the material facts are undisputed and the Court should deny

Plaintiff's motion for summary judgment and grant State Defendants' motion for summary

judgment.


Respectfully submitted,


CURTIS T. HILL, Jr.
Indiana Attorney General


By:  <u>*s/ Benjamin M. L. Jones*</u>
Benjamin M. L. Jones
Deputy Attorney General
Attorney No. 29976-53

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 14, 2018, a copy of the foregoing was filed electronically using the

Court's CM/ECF system, sending notice to the following parties who may access this filing

using the Court's system:

Mark W. Sniderman
SNIDERMAN NGUYEN LLP
mark@snlawyers.com

Robert A. Katz
INDIANA UNIVERSITY MCKINNEY
SCHOOL OF LAW
rokatz@iu.edu

Carrie L. Kinsella Katz
JACKSON LEWIS P.C.
carrie.kinsella@jacksonlewis.com

Jessica L. Liss
JACKSON LEWIS P.C.
jessica.liss@jacksonlewis.com

Melissa K. Taft
JACKSON LEWIS P.C.
melissa.taft@jacksonlewis.com

Scott James Preston
JACKSON LEWIS P.C.
scott.preston@jacksonlewis.com

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Jarros Alvin Malone
KORIN CUNNINGHAM, P.C.
jmalone@kkclegal.com

William R. Lunsford
MAYNARD COOPER & GALE PC
blunsford@maynardcooper.com

*s/ Benjamin M. L. Jones*
Benjamin M. L. Jones
Deputy Attorney General

OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN   46204
Phone:  (317) 234-6685
FAX:    (317) 232-7979
Email:   Benjamin.Jones@atg.in.gov