UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL RAY STAFFORD, | ) |
| CHARLES SMITH, | ) |
| DOUGLAS SMITH, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     No. 1:17-cv-00289-JMS-MJD |
| | ) |
| ROBERT E. CARTER, JR., | ) |
| MICHAEL MITCHEFF, M.D., | ) |
| MONICA GIPSON, R.N., | ) |
| WEXFORD OF INDIANA, LLC, | ) |
| | ) |
| Defendants. | ) |

## ORDER

This case arises out of a challenge to the medical care that inmates receive while incarcerated in Indiana Department of Corrections ("IDOC") facilities. A class of Plaintiffs who suffer from chronic Hepatitis C infection ("HCV") contends that IDOC's policies regarding HCV treatment have resulted in the withholding of effective treatment to the vast majority of HCV-infected inmates. Plaintiffs have raised three claims against three IDOC officials, (collectively, "Defendants"): Robert E. Carter, Jr., the Commissioner of IDOC, Dr. William VanNess, IDOC's Chief Medical Officer,[1] and Monica Gipson, R.N., IDOC's Director of Health Care Services. Plaintiffs contend that IDOC's treatment of individuals with chronic HCV violates the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act. Plaintiffs have moved for summary judgment on their Eighth Amendment claim, and Defendants have cross-moved for summary judgment on all claims. For the reasons

---

[1] Dr. VanNess has been automatically substituted as a defendant in place of former Chief Medical Officer Michael Mitcheff, M.D.

that follow, the Court **GRANTS** Plaintiffs' Motion as to liability on the Eighth Amendment claim, and **DENIES** Defendants' Cross-Motion on all claims.

## I.
### EVIDENTIARY OBJECTIONS

Plaintiffs raise a number of objections to evidence cited by Defendants, which the Court considers before analyzing the substantive arguments in the cross-motions for summary judgment. This is necessary because the resolution of evidentiary objections impacts the scope of information that the Court can consider in deciding the cross-motions.

### A. Expert Testimony of Dr. Neil Fisher

In their briefing in support of the cross-motions for summary judgment, both Plaintiffs and Defendants cite deposition testimony of Dr. Neil Fisher, the Corporate Medical Director for Quality Management and Pharmacy for Wexford Health Sources, Inc. ("Wexford"). [Filing No. 179-5 at 1.] Plaintiffs, however, object to certain of Defendants' cited portions of Dr. Fisher's testimony. [Filing No. 179 at 3.] Plaintiffs argue that these portions constitute expert opinion testimony, which Defendants were required to, but did not, disclose to Plaintiffs. [Filing No. 179 at 3-15 (citing Federal Rule of Civil Procedure 26(a)).] Defendants acknowledge that they never disclosed Dr. Fisher as an expert witness, but they contend that they were not required to do so. [Filing No. 180 at 6-8.]

#### 1. Federal Rule of Civil Procedure 26

Under Fed. R. Civ. P. 26(a)(2)(A), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." This disclosure, depending on the circumstances, must be accompanied either by a written report or a statement including the subject matter and a summary of the facts and opinions on which the witness is expected to testify. Fed. R. Civ. P. 26(a)(2)(B), (C). If a party fails to timely

provide information required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Seventh Circuit has held that the threat and availability of exclusion "put[s] teeth into the rule." *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998).

While Defendants acknowledge that they never disclosed Dr. Fisher as an expert witness, they argue that Rule 26 implicitly includes a disclosure exception in circumstances where a co-defendant has disclosed the requisite information. [Filing No. 180 at 6-8.] They contend that because Wexford properly disclosed Dr. Fisher as one of its expert witnesses, Defendants were not required to. [Filing No. 180 at 6-8.] Plaintiffs, on the other hand, stress that the language of Rule 26 creates no such exception. [Filing No. 179 at 7.] They also emphasize that the language of the Rule requires that a party must disclose a witness that "it"—meaning that party, not another party—may use at trial. [Filing No. 179 at 7.]

The Court agrees with Plaintiffs that Rule 26 does not create an implicit "co-defendant" exception to the disclosure requirement. The Court declines to read such a broad exception into the plain language of the Rule, and, in any event, a Committee Note accompanying the 1993 amendment to Rule 37(c) confirms that no such exception is implied. In discussing what may constitute a harmless violation of Rule 26, the Note identifies as a type of violation "the failure to list as a trial witness a person so listed by another party." Advisory Committee Note, Fed. R. Civ. P. 37(c). In other words, the Note contemplates that a co-defendant's non-disclosure would be a violation of Rule 26.

Defendants argue that, notwithstanding the Rule's plain language, the Seventh Circuit created such an exception in *S.E.C. v. Koenig*, 557 F.3d 736 (7th Cir. 2009). In *Koenig*, the

defendant hired an expert witness who prepared a report and was subject to deposition. *Koenig,* 557 F.3d at 743. The defendant ultimately did not present the expert's report or testimony at trial, but plaintiff SEC introduced the testimony via a video deposition. *Id.* The defendant argued that the district court erred in allowing that testimony to be introduced, because the SEC did not include the expert on its list of potential witnesses. *Id.* The Seventh Circuit disagreed. *Id.* at 744. The court stressed that the Rule "facilitates preparation for expert testimony," and that "[d]isclosure…permits lawyers to ask for other experts' views on the soundness of the conclusions reached by the testimonial experts." *Id.* According to the court, none of those considerations required notice regarding the SEC's desire to call the expert witness, because the defendant's legal team had the report, had been at the deposition, "and for all [the court knows] had a platoon of non-testimonial experts analyze everything [the expert] wrote and said…" *Id.* Relying heavily on the fact that the disclosure had been made by the adverse party, the court concluded that whether an adverse party "wants to question an expert whose identity has already been revealed is not a subject within the scope of Rule 26(a)(2)." *Id.* at 744.

The Court does not read *Koenig* as establishing the broad exception advocated by Defendants. *Koenig*'s reasoning relied heavily on the adverse status of the disclosing and non-disclosing parties, stressing that the purpose of Rule 26 is to allow lawyers "who are not themselves experts in…bodies of specialized knowledge…to prepare intelligently for trial," and to allow them to "ask for other experts' views on the soundness of the conclusions reached by the testimonial experts." *Koenig,* 557 F.3d at 744. The Seventh Circuit reasoned that these concerns are not implicated when an expert report is used by the originating party's adversary, because the originating party always has notice and the opportunity to scrutinize the findings of its own expert. Here, of course, the situation is not on all fours with *Koenig.* Defendants are not seeking to

introduce expert testimony generated by Plaintiffs themselves, but instead are seeking to introduce expert testimony originated by a co-defendant.

In this case, the fact that the expert testimony was disclosed by a co-defendant matters, and it highlights why the court's conclusion in *Koenig* does not extend to these circumstances. While the *Koenig* court concluded that concerns regarding the ability to prepare intelligently for trial and to ask for other expert's views were not implicated, they are squarely implicated here. Several months prior to the close of discovery, Wexford (the party that disclosed Dr. Fisher, its own employee, as an expert witness) reached a settlement agreement with Plaintiffs. [Filing No. 142 at 1.] Therefore, while discovery was ongoing, both Defendants and Plaintiffs had every indication that Wexford would no longer be a defendant in the event that this case proceeded to trial. [Filing No. 145 (setting close of discovery at March 16, 2018; Filing No. 142 at 1 (January 23, 2018 settlement conference in which agreement was reached).] Plaintiffs contend that, based on the settlement agreement and the fact that Defendants gave no indication that they intended to rely on the testimony of a putative non-party's expert witness, they conducted no further discovery into Dr. Fisher's background, opinions, positions, or credibility. [Filing No. 179 at 11.] The Court declines to extend the holding in *Koenig* to these dissimilar facts. And, based upon the text of the Rule and the Advisory Committee Note cited above, the Court concludes that Defendants' failure to disclose Dr. Fisher as an expert witness constitutes a violation of Rule 26.

### 2. Exclusion under Federal Rule of Civil Procedure 37

Rule 37(c)(1) makes exclusion of the witness the presumed remedy, except where the failure to disclose is "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996). Defendants argue that any failure to disclose in this instance was harmless, because (1) Dr. Fisher is disclosed on both Plaintiffs' and

Defendants' witness lists, and (2) the settlement agreement requires that Wexford furnish witnesses for deposition and trial. [Filing No. 180 at 8.] Plaintiffs argue that they were harmed by the failure to disclose because they had no reason to scrutinize the testimony of a putative non-party's expert witness, and they therefore did not obtain any rebuttal reports or conduct any further investigation as to Dr. Fisher.

The burden to show that non-disclosure was harmless is on the party who failed to disclose the relevant witness. *See Finley*, 75 F.3d at 1230. "A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). Rather, several factors should guide the Court's consideration: (1) unfair surprise or prejudice to the opposing party; (2) the offending party's opportunity to cure such prejudice; (3) likelihood of trial disruption; and (4) any bad faith motivating the offending party's tardy disclosure. *Id.*; *see also McAtee v. Buca Restaurants, Inc.*, 2011 WL 6016648, at *3 (S.D. Ind. Dec. 2, 2011).

In the typical case, a defendant's failure to disclose an expert witness previously identified by another defendant may well be harmless. *See Koenig*, 557 F.3d at 744. But in this case, Plaintiffs contend that they were harmed by the failure, because prior to the close of discovery, the parties had every indication that Wexford would not proceed to trial. Plaintiffs contend that they proceeded with discovery based on that settlement, and therefore did not conduct rebuttal discovery as to expert testimony by Dr. Fisher. Defendants seem to argue that Plaintiffs should have proceeded with discovery under the assumption that all of Wexford's previously disclosed expert witnesses would be used by the remaining defendants. Of course, such an assumption would generally place plaintiffs under a significant burden to conduct expensive and time-consuming expert discovery that may prove unnecessary or irrelevant. And in this case, such a

requirement would undermine much of the litigation efficiency that weighed in favor of settlement in the first place. While Dr. Fisher appears on both Plaintiffs' and Defendants' witness lists, he is not disclosed as an expert witness, and his appearance as a lay witness would be expected, given his status as Wexford employee. And although the settlement agreement requires Wexford to participate in any ongoing discovery, it only specifies that Wexford "furnish witnesses for deposition" and "cooperate in good faith with future and ongoing discovery requests."

Quite simply, when the settlement became known, Defendants could have avoided any harm by notifying Plaintiffs that they nonetheless intended to utilize the testimony of Wexford's expert witnesses. Defendants have not shown that their failure to disclose was substantially justified or harmless, and the proper remedy under Rule 37 is exclusion of the "expert" portions of Dr. Fisher's testimony, both for purposes of these Motions and at trial.[2]

Having concluded that exclusion of the expert testimony is appropriate, the Court must determine which statements are subject to exclusion. The parties appear to agree that Dr. Fisher has provided both lay and expert testimony. Federal Rule of Evidence 701 governs the admissibility of lay witness testimony, which, "as compared with opinions and inferences of experts[,] may not be based on scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702." *Tribble v. Evangelides*, 670 F.3d 753, 758-59 (7th Cir. 2012), *as amended* (Feb. 2, 2012). Lay opinion testimony "most often takes the form of a

---

[2] In a footnote, Defendants contend that Plaintiffs "did not timely move to limit or exclude Dr. Fisher's testimony at trial," contending that any such motions were due by July 2, 2018. [Filing No. 180 at 1.] The exclusion sanction imposed by Rule 37(c) is self-executing, and a separate motion under Rule 26(a)(2)(A) is not required. *See* Fed. R. Civ. P. 37, 1993 Advisory Committee Note. Plaintiffs raised their objections to Dr. Fisher's testimony in their response brief on June 21, 2018, before the July 2 deadline identified by Defendants. [Filing No. 179.] Plaintiffs specified that they did so within their brief, and not through a collateral motion to strike, in order to comply with Local Rule 56-1(i). [Filing No. 179 at 3.] Defendants offer no explanation as to how Plaintiffs' objections are untimely, and the Court identifies nothing untimely about them.

summary of firsthand sensory observations and may not provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *Id.* (internal quotation and citation omitted). Federal Rule of Evidence 702 addresses expert opinion testimony, which "results from a process of reasoning which can be mastered only by specialists in the field." *United States v. Christian*, 673 F.3d 702, 708-09 (7th Cir. 2012). Expert opinion "need not be based on first-hand knowledge of the facts of the case. It brings to an appraisal of those facts a scientific, technological or other specialized knowledge that the lay person cannot be expected to possess." *U.S. v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002).

Plaintiffs identify fourteen of Defendants' statements of material fact as being supported only by Dr. Fisher's expert testimony, and they argue that these statements must therefore be excluded from consideration. [Filing No. 179 at 3-5.] Defendants do not offer specific argument as to any individual statements, instead contending generally that Dr. Fisher's expert testimony should not be excluded. The Court declines to exclude Defendants' statement of fact 104, as the Court concludes that it is a statement of lay witness knowledge, and not an expert opinion. [*See* Filing No. 174 at 21 ("Dr. Fisher is not aware of any state that is following AASLD guidance without a level of prioritization.").]

But the Court concludes that thirteen of the statements identified by Plaintiffs should be excluded as expert opinion testimony, as they are based upon the sort of specialized medical knowledge, broad generalizations, and abstract conclusions that are all hallmarks of expert testimony. *See, e.g., Banister v. Burton,* 636 F.3d 828, 832 (7th Cir. 2011); *Walsh v. Chez*, 583 F.3d 990, 992-94 (7th Cir. 2009). The following statements are therefore excluded:

- "35. A small amount of scar tissue in the liver does not affect the liver's function. It's a large organ. With extensive fibrosis, which leads to cirrhosis when there's extensive scarring in the liver, the impairment of the liver at that time will cause

clear issues with the body." [Filing No. 174 at 7 (cited by Plaintiffs at Filing No. 179 at 4).]

- "36. Severe extrahepatic manifestations in patients with chronic HCV are rare." [Filing No. 174 at 7 (cited by Plaintiffs at Filing No. 179 at 4).]

- "37. One study showed that over a twenty year period, 15.3 percent of patients who were staged at Fibrosis level 0 or 1 progressed to state 3 or 4." [Filing No. 174 at 7 (cited by Plaintiffs at Filing No. 179 at 4).]

- "42. Treatment for patients with Hepatitis C includes monitoring, patient education, evaluation by clinicians, and laboratory analysis." [Filing No. 174 at 8 (cited by Plaintiffs at Filing No. 179 at 4).]

- "43. Use of a DAA to treat chronic HCV is not appropriate in all circumstances because of contraindications, or other reasons, why it should not be utilized. Those additional factors can include: allergic reactions, pregnancy, patients who could not complete treatment before their release date, patients with a life expectancy of less than 18 months, compliance, IV drug and alcohol use, and tattoos." [Filing No. 174 at 8 (cited by Plaintiffs at Filing No. 179 at 4).]

- "101. The AASLD guidance is basically saying that all individuals should be treated [with DAAs] except for small exceptions. However, there are always individual circumstances where a treatment guideline, which is meant to give guidance, may not be applicable to an individual patient." [Filing No. 174 at 20 (cited by Plaintiffs at Filing No. 179 at 4).]

- "102. Likewise, the standard of care is standard of care, and it should apply to different environments, but there may be different influences of why the care would be different in a different environment. Each individual case is different. So guidelines guide general treatment, they don't guide the course for any one individual. You don't treat according to what a guideline says. You treat…according to what the individual's circumstances is. It's [sic] individual clinical decisions. Because, every patient case is unique and different, and that's part of the considerations of the FBOP guidance that each case is unique." [Filing No. 174 at 20 (cited by Plaintiffs at Filing No. 179 at 4).]

- "103. The AASLD and FBOP are among many guidelines regarding the treatment of HCV. There are also guidelines from the European Association of the Study of Liver Disease, the World Health Organization, and others. Each guideline views HCV a little bit differently, as whenever you get a committee together, they will look at the data somewhat differently and may come up with a different guideline based on it." [Filing No. 174 at 20 (cited by Plaintiffs at Filing No. 179 at 5).]

- "105. Fisher would not recommend a blanket policy of treating all offenders who have chronic Hepatitis C, except those excluded from the AASLD guidance,

because each individual case is different[,] and there may be other issues with therapy." [Filing No. 174 at 21 (cited by Plaintiffs at Filing No. 179 at 5).]

- "107. In evaluating the standard of care, a consideration is what the community is actually doing, which would include reviewing prioritization criteria used nationwide. Prioritizing treatment based on APRI score is used nationwide and has not been developed solely by Indiana." [Filing No. 174 at 21 (cited by Plaintiffs at Filing No. 179 at 5).]

- "108. Dr. Fisher believes that the standards and procedures currently in place in Indiana are consistent with the applicable standard of care, based upon HCSD 3.09 and the prioritization guidance from the Federal Bureau of Prisons." [Filing No. 174 at 21 (cited by Plaintiffs at Filing No. 179 at 5).]

- "109. All offenders in IDOC identified as HCV antibody positive are being treated…by being seen regularly, chronic care clinics, having blood work monitored, being educated about their disease…" [Filing No. 174 at 21 (cited by Plaintiffs at Filing No. 179 at 5).]

- "110. Chronic HCV is influenced by both static and modifiable factors, which permit the disease to be managed by changes in patient behavior through monitoring and counseling. Monitoring, patient education, and discussion of risk strategies are all treatment for HCV." [Filing No. 174 at 21-22 (cited by Plaintiffs at Filing No. 179 at 5).]

These statements are excluded for the purposes of the cross-motions for summary judgment and all subsequent proceedings, and any expert opinion testimony by Dr. Fisher is excluded in any subsequent proceedings.

### B. Expert Testimony of Dr. William VanNess

Plaintiffs also move to exclude the expert testimony of Dr. William VanNess, IDOC's Chief Medical Officer, on the basis that Defendants never disclosed him as an expert witness. *See* Fed. R. Civ. P. 26(a), 37(c)(1). Defendants respond that they are not seeking to introduce any expert testimony by Dr. VanNess, and that the statement of material fact identified by Plaintiffs does not constitute expert testimony. The challenged statement is as follows:

Of patients with chronic HCV, 10 to 20 percent over 20 to 30 years may well develop cirrhosis, and so, again, the other's [sic] don't. They get no sequelae and may die of a heart attack or a stroke or something else over 20 or 30 years and not develop any cirrhosis. So, in my mind the key is to be able to evaluate the patient

to know when to intervene with treatment, not to treat everybody, but to intervene at the appropriate time.

[Filing No. 174 at 15 (cited by Plaintiffs at Filing No. 179 at 4).] Defendants contend that this statement does not constitute an expert opinion because it is "a recitation of a generally accepted statistic," and because a lay person knows that "over a twenty to thirty year period a person may die of a heart attack, stroke, or something other than Hepatitis C." [Filing No. 180 at 6.] They also argue that the last portion of the statement is not expert testimony, because it concerns only Dr. VanNess's "use of these facts in determining his approach toward HCSD 3.09." [Filing No. 180 at 6.]

The Court agrees with Plaintiffs that this statement constitutes expert testimony. The first portion of this statement is based on applying to the facts of this case "an appraisal of those facts a scientific, technological or other specialized knowledge that the lay person cannot be expected to possess." *U.S. v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002). While the statistic cited by Dr. VanNess may be widely accepted in the medical field, lay persons certainly would not be expected to possess that specialized knowledge. And that testimony depends on broad generalizations regarding the progression of Hepatitis C and abstract conclusions regarding its treatment. *See Tribble*, 670 F.3d at 758 ("Broad generalizations and abstract conclusions are textbook examples of opinion testimony."). Defendants acknowledge that Dr. VanNess may only provide lay opinion testimony, and this statement does not fall within that characterization. It is therefore excluded.

### C. Miscellaneous Evidentiary Objections

Plaintiffs object to Defendants' statement of material fact number six on the basis that it constitutes inadmissible hearsay. [Filing No. 179 at 2.] That statement is as follows: "During a September 2017 meeting between Wexford and IDOC, Dr. Fisher and John Dallas told IDOC that 'we feel like we should treat more offenders at this point,' which Dr. VanNess approved of."

[Filing No. 174 at 3.] Defendants argue that this statement is not hearsay, because it is not being introduced to prove the truth of the matter asserted, but rather, to demonstrate its effect on the listener, Dr. VanNess. The Court agrees that, to the extent that Defendants seek to introduce the quote within that statement for the truth of the matter it asserts, it is inadmissible hearsay under Federal Rule of Evidence 802. To the extent that they seek to introduce the statement for another purpose, the Court will evaluate it at that juncture.

Plaintiffs object to two of Defendants' statements of material fact as being inadmissible, contending that they are not based upon the personal knowledge of the speaker and lack foundation. [Filing No. 179 at 2.] Defendants respond that those statements are admissible, because a person's understanding is something within his own personal knowledge. [Filing No. 180 at 4-5.] Those statements are as follows:

- "8. Dr. Van Ness's understanding is that Wexford nevertheless began treating more offenders with DAAs." [Filing No. 174 at 3.]

- "20. Plaintiff Douglas Smith understands that the policy grants authority to prescribe DAA medications for HCV to the medical provider." [Filing No. 174 at 5.]

Federal Rule of Evidence 602 states that a "witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. As to the first statement, to the extent that it is being introduced to show that Wexford actually *was* treating more inmates, Defendants offer no evidence as to how Dr. VanNess came to that understanding or whether he had any actual knowledge of what occurred. *See Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 730 (7th Cir. 2014) (upholding exclusion of statement that it was a witness's "understanding ... [that] promises [were] made to support this bill[,]" and concluding that "[n]ot only is that comment an out-of-court statement offered to prove the truth of the matter asserted; the underlying sentiment is not based on personal knowledge.");

*Maier v. Lucent Techs., Inc.,* 120 F.3d 730, 737 (7th Cir. 1997) (upholding exclusion of testimony based on witness's "understanding" where there was no evidence of underlying personal knowledge).  It is Defendants' burden to introduce evidence sufficient to show personal knowledge, and they have not done so here.  The same is true as to the second statement.  Those statements, therefore, are both excluded.

## II.
### LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts

are not outcome-determinative. *Montgomery v. American Airlines Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

**BACKGROUND**

**A. Hepatitis C**

Hepatitis C is a contagious viral disease that causes inflammation of the liver and affects other parts of the body.  [Filing No. 166-1 at 2.]   HCV infection is generally transmitted through blood or blood products, and it occurs in two stages: acute and chronic.  [Filing No. 100-1 at 2.] The acute infection phase spans the first six months of exposure to the virus.  [Filing No. 100-1 at 2.]  Approximately 15-25% of infected individuals self-resolve during this period and do not develop chronic HCV infection.  [Filing No. 100-1 at 2.]   Approximately six months after infection, the remaining 75-85% of infected persons move into the chronic phase.  [Filing No. 100-1 at 2.] Chronic HCV infection does not self-correct, and infected individuals will remain infected for life if not treated with appropriate medication.  [Filing No. 100-1 at 2-3.]

Individuals suffering from chronic HCV may be symptom-free, or they may suffer from symptoms such as fatigue, joint pain, nerve pain, skin disorders, jaundice, ascites (fluid accumulation in the abdomen), hepatic encephalopathy (confusion due to high ammonia levels), gastro-intestinal bleeding, and liver cancer.  [Filing No. 100-1 at 2.]  Absent treatment, HCV will inevitably progress through all of the stages of infection, leading to cirrhosis of the liver.[3]  [Filing No. 166-4 at 21-25.]  Within twenty to thirty years of chronic infection, between five and twenty percent of HCV-infected persons will develop cirrhosis of the liver, and one to five percent of people will die from the consequences of chronic HCV. [Filing No. 100-1 at 3.]  That progression

---

[3] The term "cirrhosis" refers to "any of a group of chronic diseases of the liver characterized by loss of normal lobular architecture with fibrosis, and by destruction of parenchymal cells and their regeneration to form nodules."  *Dorland's Medical Dictionary*, online version available at www.dorlands.com, last accessed August 29, 2018.

may occur more quickly in individuals who are older at the time of infection, obese, have other viral diseases, or are subject to other factors that speed progression in individual cases. [Filing No. 166-4 at 17.] Even before HCV reaches an advanced stage, it can cause harm such as kidney failure, diabetes, decreased cognitive function, joint pain, nerve damage, and other conditions. [Filing No. 166-1 at 2.] Chronic HCV is the leading cause of cirrhosis of the liver and is the most common reason for liver transplantation in the United States. [Filing No. 100-1 at 3.]

Generally, doctors measure a patient's degree of fibrosis, or scarring of the liver, to determine what stage of infection a patient is experiencing. [Filing No. 166-4 at 18.] The progression of fibrosis is described in progressive stages ranging from zero, where there is no fibrosis present, to four, where advanced fibrosis (cirrhosis) is present. [Filing No. 166-4 at 18.] There are several methods for measuring the degree of fibrosis. [Filing No. 166-4 at 18.] One histological method, called a METAVIR score, requires a liver biopsy. [Filing No. 166-4 at 18.] Another method, the APRI score, is based on biomarkers and uses routinely available blood tests to estimate fibrosis levels. [Filing No. 166-4 at 22.] An APRI score can identify advanced fibrosis in stages three and four, but its performance at lower levels is less accurate. [Filing No. 166-4 at 22 (performance at lower levels is "not great").] HCV progression can also be measured by a device called a Fibroscan, which non-invasively measures liver stiffness. [Filing No. 166-4 at 18.]

Chronic HCV is a curable condition. [Filing No. 100-1 at 3.] Direct-Acting Antiviral oral medications ("DAAs") cure HCV by preventing the virus from replicating, eventually eliminating it from the body. [Filing No. 166-4 at 30.] Treatment generally lasts 12 weeks, but in patients who do not have advanced fibrosis, some DAA regimens allow for treatment lasting 8 weeks. [Filing No. 166-4 at 34.] Treatment in some patients in advanced stages can take up to 24 weeks. [Filing No. 166-4 at 34-35.] Several different DAAs have been approved by the Food and Drug

Administration for treatment of HCV, [Filing No. 100-1 at 4], and the current cure rate for patients treated with DAAs is nearly 100 percent. [Filing No. 166-4 at 38.]  Treatment options prior to the development of DAA drugs involved the use of a three-drug combination, which was often ineffective and was marked by significant side effects including anemia, nausea, bone pain, joint pain, anxiety, depression, memory loss, and death.  [Filing No. 166-1 at 3.]

In order to provide healthcare professionals with timely guidance regarding the treatment of HCV, the Infectious Diseases Society of America ("IDSA") and the American Association for the Study of Liver Diseases ("AASLD") convened a panel of experts known as the HCV Guidance Panel (the "Panel").  [Filing No. 166-1 at 3.]  The Panel's guidance is set forth in a document called "HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C" (the "AASLD Guidance"), which is available to the public through the Panel's website.  [Filing No. 166-1 at 3; www.hcvguidelines.org.]  The Panel recommends treatment with DAAs for all patients with chronic HCV infection, except those with short life expectancies that cannot be remediated by treatment, by transplantation, or by other directed therapy.  [Filing No. 166-1 at 3.]  The Panel's guidance is the national standard of care with respect to the treatment of patients with HCV, [Filing No. 166-1 at 4], and the Centers for Disease Control encourages healthcare professionals to follow the Panel's recommendations, [Filing No. 100-1 at 4].  The most recent update to that guidance includes a section addressing HCV testing and treatment in correctional settings, and it recommends that individuals in prison receive treatment according to the AASLD Guidance. [Filing No. 183-1 at 3.]

DAAs are the only effective treatment for HCV, [Filing No. 166-4 at 60], and there is no medical reason to ration the use of DAAs, [Filing No. 166-1 at 4].  Delaying treatment for chronic HCV until patients have developed more advanced stage liver fibrosis has been demonstrated to

result in two to five times higher rates of liver-related mortality, as compared to those offered treatment at an earlier stage. [Filing No. 100-1 at 6.] Curing chronic HCV has been associated with reduced risk of liver cancer by 83.5% and overall death by 74%. [Filing No. 100-1 at 7.] Curing chronic HCV is also associated with a decreased need for liver transplantation, and decreases patients' risk of dying from diseases other than HCV. [Filing No. 100-1 at 6.] Patients cured of HCV also report improvements in their quality of life. [Filing No. 100-1 at 5.]

**B. IDOC's HCV Treatment Policy**

IDOC contracts with Wexford to provide medical services to individuals incarcerated in IDOC facilities, and Dr. VanNess is responsible for overseeing the quality of the medical vendor. [Filing No. 166-5.] The contract requires Wexford to abide by IDOC's health care directives, including "Health Care Services Directive 3.09" ("HCSD 3.09"). [Filing No. 166-5 at 2; Filing No. 166-6.] HCSD 3.09 was drafted by Dr. VanNess, with the assistance of Ms. Gipson. [Filing No. 166-9 at 40; Filing No. 166-9 at 91.] HCSD 3.09 requires that all incoming and returning inmates be screened for the presence of the HCV antibody "in accordance with State statute." [Filing No. 166-6 at 2.] It also requires that a baseline clinical evaluation be performed for all inmates diagnosed with HCV within 90 days of arrival. [Filing No. 166-6 at 2.] It then mandates that health services staff "shall manage offenders with HCV in accordance with the Federal Bureau of Prison's [sic] 'Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection.'" [Filing No. 166-6 at 2.] The contract requires Wexford to place $1.5 million in escrow to provide exclusively for HCV treatment, and any expenditure over that amount must be requested by IDOC's Chief Medical Officer. [Filing No. 173-1 at 79; Filing No. 100-7 at 7.]

The Federal Bureau of Prisons Guidance ("FBOP Guidance"), in turn, recommends the use of an APRI score to determine the degree of fibrosis present in each patient. [Filing No. 166-12

at 8.] The FBOP Guidance then sets out priority levels for treatment, ranging from one to three. [Filing No. 166-12 at 13.] The Guidance identifies "Level 1" inmates as a high priority for treatment, and this level includes individuals with an APRI score of 2.0 or higher, or stages three or four fibrosis on a liver biopsy. [Filing No. 166-12 at 13.] "Level 2" inmates are an intermediate priority for treatment, and that category includes those with an APRI score of 1.0 or higher, or stage two fibrosis on a liver biopsy. [Filing No. 166-12 at 13.] Inmates in "Level 3" are those with an APRI score of less than 1.0, or stage zero or one fibrosis on a liver biopsy, and they are considered low priority for treatment. [Filing No. 166-12 at 13.] The FBOP Guidance states that exceptions to those criteria "will be made on an individual basis and will be determined primarily by a compelling or urgent need for treatment, such as evidence of rapid progression of fibrosis, or deteriorating health status from other comorbidities." [Filing No. 166-12 at 13.] Dr. VanNess was aware at the time of the drafting of HCSD 3.09 that the prioritization policy differs from the AASLD Guidance, which constitutes the nationally accepted standard of care for HCV. [Filing No. 166-8 at 98-100.]

Wexford is required to maintain a log of inmates infected with HCV. [Filing No. 166-10 at 12; Filing No. 166-5 at 10.] As of September 2017, there were 3,476 inmates identified as suffering from chronic HCV, including plaintiffs Michael Stafford, Douglas Smith, and Charles Smith. [Filing No. 166-7 at 1-2.] Of those inmates, 122 had APRI scores of greater than 2.0, and 483 had APRI scores of greater than 1.0. [Filing No. 166-7 at 2.] Between April 1, 2017 (the date of Wexford's contract commencement) and January 19, 2018, a total of 41 inmates had either completed or were receiving treatment with DAAs. [Filing No. 167 at 9.]

**C. Procedural History**

The named Plaintiffs filed the instant suit on behalf of themselves and similarly situated present and future IDOC inmates, claiming that IDOC's failure to treat their chronic HCV violates the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act. [Filing No. 39.] The Court certified a class of "[a]ll current and future prisoners in IDOC custody who have been diagnosed, or will be diagnosed, with chronic HCV." [Filing No. 154 at 17.] Plaintiffs have filed a Motion for Summary Judgment on their deliberate indifference claim, and Defendants have cross-moved for summary judgment on all claims. [Filing No. 166; Filing No. 173.] Those Motions are now ripe for the Court's review.

**IV.**
**DISCUSSION**

Plaintiffs move for summary judgment on their Eighth Amendment claim, and Defendants cross-move for summary judgment as to that claim. Defendants also move for summary judgment on Plaintiffs' ADA and Rehabilitation Act claims, which Plaintiffs oppose. The Court addresses each claim in turn.

**A. Eighth Amendment: Deliberate Indifference**

The Eighth Amendment imposes upon prison officials a duty to provide humane conditions of confinement, and it "safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Roe v. Elyea*, 631 F.3d 843, 856-57 (7th Cir. 2011) (internal quotation and citation omitted). Accordingly, "deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Roe*, 631 F.3d at 857 (internal quotation and citation omitted). In order to establish deliberate indifference, an inmate must satisfy both an

objective and a subjective element.  *Id.*  The Court addresses each in turn, but first addresses a class certification issue.

### 1. Class Definition

In the case of a class certified under Rule 23, "the judge remains free to modify it in the light of subsequent developments in the litigation."  *Gen. Tel. Co. of SW v. Falcon,* 457 U.S. 147, 160 (1982).  The parties' summary-judgment briefing highlights a distinction that may be appropriately addressed within the definition of the Plaintiff class.  At the class certification stage, the Court assumed, and Plaintiffs confirm here, that they seek treatment with DAAs only for those Plaintiffs for whom treatment is not medically contraindicated.  [Filing No. 179 at 18 ("Plaintiffs seek treatment with DAAs, the only effective, evidence-based cure for their condition, *unless treatment is contraindicated*.") (emphasis in original).]  In order to clarify the proper scope of the relief at issue, the class is hereby modified to include the following individuals: all current and future prisoners in IDOC custody who have been diagnosed, or will be diagnosed, with chronic HCV, and for whom treatment with DAA medication is not medically contraindicated.

### 2. Objective Element: Sufficiently Serious Medical Need

In the medical care context, an inmate satisfies the objective element of the deliberate indifference standard if he demonstrates that his medical need was sufficiently serious.  *Roe,* 631 F.3d at 857.  A medical need is considered sufficiently serious "if the inmate's condition has been diagnosed by a physician as mandating treatment or…is so obvious that even a lay person would perceive the need for a doctor's attention."  *Id.*  A medical condition "need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated."  *Id.*  And "the Eighth Amendment protects an inmate not only from deliberate indifference to his or her *current* serious health

problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health." *Id.* at 858 (emphasis in original).

Defendants appear to overlook the objective element, stating that "[d]eliberate indifference is a subjective standard," and therefore do not address it in their briefing. [Filing No. 174 at 26.] Plaintiffs contend that the undisputed evidence establishes that HCV constitutes a serious medical condition, due to its risks both to current and future health. [Filing No. 167 at 19-20.]

The undisputed medical evidence establishes that individuals suffering from chronic HCV may experience symptoms such as fatigue, joint pain, nerve pain, skin disorders, jaundice, ascites, hepatic encephalopathy, gastro-intestinal bleeding, and liver cancer. Within twenty years of chronic infection, many individuals will develop cirrhosis of the liver, and between one and five percent of people will die from the consequences of chronic HCV. Physicians cannot predict with precision the rate at which progression will occur in individual patients. And even before HCV reaches an advanced stage, it can cause harm such as kidney failure, diabetes, decreased cognitive function, joint pain, nerve damage, and other conditions.

Based on this undisputed evidence, the Court concludes, as have many other courts that have considered the issue, that chronic HCV constitutes a serious medical condition. *See, e.g.,* *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1299 (N.D. Fl. 2017); *Parks v. Blanchette*, 144 F. Supp. 3d 282, 314 (D. Conn. 2015); *Hilton v. Wright*, 928 F. Supp. 2d 530, 547-48 (N.D.N.Y. 2013).[4]

---

[4] The Court notes that Defendants, in passing, raise one argument that could be construed as a challenge to the objective element of the standard. They argue in a single sentence, citing an Eighth Circuit case, that "with regard to HCV specifically, at least one Circuit Court has recognized that the question under the Eighth Amendment is…whether [HCV] presents a serious medical need for *prompt* treatment." [Filing No. 174 at 29 (emphasis added).] The Court addresses the substance of this argument in a later section.

*3. Subjective Element: Defendants' Cross-Motion for Summary Judgment*

To satisfy the subjective element, an "inmate must establish that prison officials acted with a sufficiently culpable state of mind to support liability under § 1983." *Roe*, 631 F.3d at 857. An inmate need not show that prison officials "actually intended harm to befall him from the failure to provide adequate care. It is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id.* (internal quotation and citations omitted).

The entirety of the parties' dispute regarding the deliberate indifference claim centers on whether Defendants knew of a substantial risk of harm to Plaintiffs and disregarded that risk. Plaintiffs' argument in support of summary judgment is simple and straightforward: HCV can be cured with 12 weeks of oral medication, but currently only 41 people, or 1.2% of those inmates known to suffer from chronic HCV, have received any DAA treatment. [Filing No. 167 at 20-26.] And, Plaintiffs argue, Defendants have presented no medical justification for failing to treat that 98.8% of infected inmates. [Filing No. 167 at 20-26.]

Defendants raise four substantive arguments in opposition to Plaintiffs' Motion, and in support of their Cross-Motion, all in the service of the same general proposition: Plaintiffs are receiving all of the treatment that is medically required. The Court restates those arguments as follows: (a) that IDOC policy allows for individualized treatment decisions by Wexford physicians; (b) that the selection of one course of treatment over another does not constitute deliberate indifference; (c) that Plaintiffs are experiencing a permissible delay in treatment; and (d) that Plaintiffs' claim depends on the faulty assertion that the standard of care requires the prescription of DAA medication to all chronic HCV patients. The Court addresses Defendants'

arguments first, considering Plaintiffs' responses in opposition, and then turns to Plaintiffs' Motion.[5]

### a. Role of HCSD 3.09 and FBOP Guidance: Individualized Treatment

Defendants argue that their HCV treatment policy cannot form the basis of a deliberate indifference claim because, while the policy creates a generalized protocol for treatment, it also provides for individualized treatment assessments. [*See, e.g.,* Filing No. 174 at 26 ("Plaintiffs cannot show that the Defendants, by drafting a policy that prioritizes treatment, but expressly authorizes the medical professionals to exercise their professional medical judgment as to the individualized circumstances of their patients, are deliberately indifferent to their serious medical needs.").] There are two contentions embedded in Defendants' quoted statement: (1) that any policy allowing for individualized assessment is *per se* constitutionally sufficient; and (2) that Wexford physicians—not IDOC policy—are responsible for treatment decisions, and therefore any resultant harm.

In their first contention, Defendants suggest that the prioritization policy enshrined in HCSD 3.09 cannot be deliberately indifferent because the policy states that exceptions to the prioritization can be made on an individual basis. [Filing No. 166-12 at 13.] The Seventh Circuit has indicated that the use of treatment guidelines and protocols is not *per se* unconstitutional. *See Roe*, 631 F.3d at 860. In some circumstances, factors such as "administrative convenience" and the cost of treatment alternatives may be "permissible factors for correctional systems to consider in making treatment decisions." *Roe*, 631 F.3d at 863; *see also Johnson v. Doughty*, 433 F.3d 1001, 1013-14 (7th Cir. 2006). But "the Constitution is violated when they are considered *to the*

---

[5] Defendants' briefing regarding the deliberate indifference claim proceeds in a somewhat stream-of-consciousness manner, spanning nine pages and including no sub-headings or other indicators of specific arguments. The Court has done its best to identify and restate the arguments raised.

*exclusion of reasonable medical judgment* about inmate health." *Roe*, 631 F.3d 863 (emphasis in original); *see also Johnson*, 433 F.3d at 1013 (concluding that "medical personnel cannot simply resort to an easier course of treatment that they know is ineffective").

Defendants have offered no evidence, or even any argument, that any medical basis underlies or supports the "prioritization" approach advocated by the FBOP Guidance and adopted by IDOC. And Plaintiffs' undisputed evidence establishes that there is none. It is undisputed that treatment with DAA medication represents the medical standard of care for treatment of chronic HCV, regardless of the level of fibrosis or APRI score. [*See, e.g.,* Filing No. 166-1 at 4 (Declaration of Dr. Raj Vuppalanchi) ("DAAs are the standard of care, regardless of fibrosis score…"); Filing No. 166-2 at 7 (Declaration of Dr. Suthat Liangpunsakul) (treatment with DAAs represents the medical standard of care).] The undisputed medical evidence establishes that physicians utilize assessments of the degree of fibrosis in order to accurately "stage" an individual's disease, or to determine the appropriate length of treatment, but not to determine whether administration of medication is appropriate or medically indicated. [Filing No. 166-4 at 18; Filing No. 166-4 at 35; Filing No. 173-4 at 36; Filing No. 173-4 at 8-10.] Defendants raise some arguments regarding the appropriate use and timing of DAA treatment, which the Court addresses further in later sections. But, as relevant here, it is undisputed that there is no medical justification for dividing individuals into treatment categories based on the degree of fibrosis or the progression of their disease as determined by the APRI score. [Filing No. 166-1 at 4 (Dr. Vuppalanchi stating that "there is no medical reason to ration" the use of DAAs, and "delayed treatment is below the standard of care, is not medically defensible, and will cause harm").]

In some "appropriate" circumstances "administrative convenience and cost may be permissible factors for correctional systems to consider in making treatment decisions…." *Roe,*

631 F.3d at 863.  And Plaintiffs contend that cost appears to be the biggest driver of IDOC's HCV treatment policies, citing IDOC's stated desire to remain within a $1.5 million annual budget for HCV treatment and the $25,000 expense to treat each patient with DAAs.  [Filing No. 167 at 25.]  But Defendants do not contend that the prioritization system was adopted on the basis of cost savings, and indeed they completely eschew cost as the motivating force.  [*See* Filing No. 174 at 32 ("…the undisputed material facts establish that cost was not the deciding factor in determining IDOC policy.").]  Nor do Defendants argue that administrative convenience underlies the policy, and they have presented no evidence that the administration of oral DAA medication to a larger number of inmates would impose an untenable administrative burden that this policy was intended to prevent.  Instead, Plaintiffs present undisputed evidence, including lay testimony from Dr. Fisher, Wexford's Corporate Medical Director for Quality Management and Pharmacy, that inmates with HCV can be very effectively identified and treated while incarcerated, because they are in a controlled environment and under observation.  [Filing No. 166-1 at 4-5; Filing No. 166-4 at 49-50; Filing No. 166-8 at 80-81.]

Defendants offer only one rationale for the adoption of the prioritization policy, which the Court repeats in its entirety: "Dr. VanNess chose to adopt the FBOP guidelines for HCV because the FBOP approach 'made sense to him' in that 'it was about the individual, about understanding the individual from a medical standard, having a good baseline, and then treating them as individuals based on all the parameters that go into their care.  Everybody's different.'" [Filing No. 174 at 15 (citing Filing No. 173-1 at 27-28).]  This explanation, to state it plainly, provides no rational support for the adoption of HCSD 3.09.  If Defendants' primary concern were the individualized treatment of each inmate for his or her HCV, no categorization or prioritization would be necessary.  Indeed, prioritization is more a foe to individualized treatment than a friend.

Without the prioritization system, each individual would be treated without reference to a treatment category, but instead based solely on his own symptoms and medical presentation.

In their "Statement of Material Facts Not in Dispute," Defendants also state that "[p]rioritization of treatment for offenders with Hepatitis C is typically followed in the world of corrections." [Filing No. 19 at 38.] It is not clear whether Defendants include this statement of fact as a possible justification for the policy, but the widespread usage of any given policy does not itself provide support for the policy's compliance with constitutional requirements. While Defendants seem to suggest that the FBOP Guidance is entitled to some special consideration, perhaps akin to the status of expert medical testimony, there is no evidentiary foundation to afford it such treatment.[6]

Finally, while Defendants rely heavily on the role of "individualized treatment" decisions allowed for within the FBOP Guidance, the Guidance makes clear that the priority criteria govern, and that deviations from them are considered "exceptions." The individualized assessment component of the Guidance is described in a footnote, reproduced below:

---

[6] The Court notes here that unlike the Federal Bureau of Prisons, other large, federal public institutions have taken a decidedly different approach to HCV treatment. Dr. Liangpunsakul's undisputed testimony is that, in his experience treating HCV patients through the Veterans Affairs Administration, the treatment team (comprised of two physicians and three pharmacists) has always recommended treatment with DAA medication for individuals for whom treatment is not medically contraindicated, and every individual has received that treatment. [Filing No. 173-4 at 13.] The Court also takes judicial notice of a letter sent by the Centers for Medicare and Medicaid Services to their state counterparts in 2015, expressing concern that "some states are restricting access to DAA HCV drugs contrary to the statutory requirements of [the Social Security Act] by imposing conditions for coverage that may unreasonably restrict access to these drugs. For example, several state Medicaid programs are limiting treatment to those beneficiaries whose extent of liver damage has progressed to metavir fibrosis score F3, while a number of states are requiring metavir Fibrosis scores of F4." The letter also refers states to the AASLD Guidance. Available at https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/downloads/rx-releases/state-releases/state-rel-172.pdf, last accessed September 12, 2018.

* EXCEPTIONS to the above criteria for PRIORITY LEVELS 1–3 will be made on an individual basis and will be determined primarily by a compelling or urgent need for treatment, such as evidence for rapid progression of fibrosis, or deteriorating health status from other comorbidities.

[Filing No. 166-12 at 13.] Defendants seek to minimize the role of the priority criteria in favor of a physician's ability to make individualized assessments, but the Guidance itself anticipates that those individualized decisions will constitute "exceptions" to the rule which must be supported by "compelling" or "urgent" needs. Moreover, Defendants present no evidence that physicians do in practice deviate from the priority groups in their determinations of who, in the language of the FBOP Guidance, will be "considered" for treatment. [Filing No. 166-12 at 12.]

As described above, as of September 2017, 3,476 inmates were identified as suffering from chronic HCV. As of that date, 122 inmates had an APRI score of greater than 2.0, placing them in the high priority category for treatment. 483 had an APRI score greater than 1.0, placing them in the high or intermediate category. But between April 1, 2017 and January 19, 2018, only 41 inmates had either completed or were receiving treatment with DAAs. Defendants have offered no specific evidence as to who has received treatment and what their priority level was prior to being treated. But, based on the numbers alone, not even all of those inmates designated as "high priority" for treatment have received it. And in total, only 1.2% of inmates with chronic HCV have received treatment.

In sum, neither the policy enshrined in HCSD 3.09, nor Defendants' proffered rationale for its adoption, establish that Defendants are necessarily in compliance with the demands of the Eighth Amendment.

Defendants next argue that, even if some harm results from application of the policy, Wexford physicians are responsible for applying it and making treatment decisions, so IDOC may not be held liable. The undisputed facts, however, lead inexorably to the conclusion that

Defendants seek to control physicians' treatment decisions by providing parameters within which they should consider an individual eligible for HCV treatment at all. [*See* Filing No. 166-12 at 12 (FBOP Guidance describing priority "*consideration for* treatment").] It is undisputed that Wexford is contractually obligated to follow the policy enshrined in IDOC's HCSD 3.09, which was drafted by Dr. VanNess. [Filing No. 166-9 at 90-91.] As described above, that policy adopts the FBOP Guidance, which creates the "priority criteria" that govern at a fairly granular level the treatment of HCV. [Filing No. 166-12 at 12.] Even taking the facts in the light most favorable to Defendants, the only logical inference that can be drawn from them is that IDOC's policy is intended to govern the treatment of HCV-infected inmates—otherwise physicians would be left to simply apply their own medical judgment as to the proper course of treatment for each inmate. And, as noted, Defendants cap the total amount that can be spent, regardless of individualized patient needs.

And Defendants cannot avoid liability by pointing the finger at Wexford as the direct healthcare provider. As the Seventh Circuit has noted in the context of the delegation of state functions to private correctional healthcare providers, medical care in the prison context "is simply not unaffected by the fact that the state control[s] the circumstances and sources of a prisoner's medical treatment." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 826 (7th Cir. 2009). In addition to being the architects of the prioritization system, and making its application mandatory on Wexford, the undisputed evidence establishes that Dr. VanNess knew when he drafted HCSD 3.09 that the medical standard of care for treatment for HCV, as indicated by the AASLD Guidance, recommends treatment for all individuals suffering from HCV, except for those for whom DAAs are medically contraindicated. [Filing No. 166-9 at 49.] Dr. VanNess was also aware that the prioritization policy adopted by IDOC differs from the AASLD Guidance. [Filing

No. 166-8 at 98-100.]  The Court rejects Defendants' contention that they cannot be held liable for any deliberate indifference, simply because Wexford physicians were charged with providing the actual treatment.  This argument ignores the reality that Wexford physicians are required to provide treatment within the constraints established by Defendants.

For all of these reasons, the Court concludes that Defendants are not entitled to summary judgment on the rationale that their HCV treatment policy cannot form the basis of a deliberate indifference claim.

### b. Selection of Treatment Option

Defendants also argue that they are entitled to summary judgment because "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." [Filing No. 174 at 28.]  They contend that they are not disregarding a substantial risk of harm, arguing that "treatment" of HCV includes "monitoring labs, genotypic testing of the HCV infection, counseling, pain medication, and vitamins," [Filing No. 174 at 29], which they are providing.  Defendants argue that Plaintiffs simply disagree with a particular "prescribed course of treatment," and that such a disagreement "falls short of deliberate indifference."  [Filing No. 180 at 12.]  Plaintiffs respond that they do not take issue with a specific prescribed course of treatment—they argue that the inmates who are not receiving DAA medication are instead receiving no treatment at all.  [Filing No. 179 at 22-23.]

An inmate is not entitled to demand specific care, and he is not entitled to the "best care possible."  *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (citing *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (concluding that inmate did not have the right to demand one effective medication in lieu of another effective medication)).  But prison officials may not, within the

confines of the Eighth Amendment, opt for a course of treatment that is known to be ineffective. *Id.* (citing *Berry v. Peterman*, 604 F.3d 435, 441-42 (7th Cir. 2010)).

Defendants make the factual assertion that "monitoring labs, genotypic testing of the HCV infection, counseling, pain medication, and vitamins" constitute effective treatment for HCV, and Plaintiffs dispute that factual assertion. [Filing No. 174 at 29; Filing No. 179 at 2 (identifying this as a disputed material fact).] Defendants, however, offer no evidence, medical or otherwise, to support the assertion that any of those actions constitute effective treatment for chronic HCV.[7] On the other hand, Plaintiffs have presented undisputed medical evidence (in the form of expert testimony) that blood draws, monitoring, and patient education do not constitute effective treatment. [*See, e.g.,* Filing No. 166-4 at 60 (Deposition of Dr. Vuppalanchi) (a patient with chronic HCV is not effectively treated by blood draws, monitoring, and education).]

Moreover, even the FBOP Guidance on which Defendants generally rely contradicts Defendants' assertion as to the activities that constitute effective "treatment." Section Five of that document details the priority criteria for treatment, and in discussing the application of those criteria, it describes patients as being under "consideration for treatment." In other words, it does not assume that all inmates will, upon initial assessment, be "treated" for their HCV. Section Six

---

[7] Even if the Court were to consider Dr. Fisher's excluded expert testimony, its conclusion would remain the same on this point. While Dr. Fisher testified that those activities constitute "treatment" of chronic HCV, his testimony does not support the conclusion that such "treatment" is effective. [*Compare* Filing No. 173-2 at 37 ("Q: Your position is even if you are not getting DAAs, you are still getting treatment for HCV if you are getting monitored; is that right? A: Monitored and also receiving patient education and a discussion of risk strategies.") *with* Filing No. 173-2 at 52 (Q: "Successful Hepatitis C treatment results in sustained virologic response, which is tantamount to virologic cure and, as such, is expected to benefit nearly all chronically infected persons. … Do you agree with that statement? A: Yes."); *and* Filing No. 173-2 at 82 ("Q: If patients with chronic HCV are not given DAAs and they just get education, would that cure them of the HCV? A: It will not cure them of the HCV."); Filing No. 173-2 at 83 ("Q …can somebody be cured of a chronic HCV infection by lab draws, by patient education, and by monitoring alone? A: Cure, no.").]

governs "Recommended Treatment Regimens," and the only "treatment" option enumerated is DAA medication. [Filing No. 166-12 at 14-18; *see also* Filing No. 166-12 at 20 (describing monitoring for individuals who are "not yet treated").] This is simply not a circumstance analogous to those in which prison officials have chosen one effective course of treatment over another—here, Defendants have expressly chosen non-treatment over treatment for the Plaintiff class.

Facing cross-motions for summary judgment, Defendants are required to identify specific, admissible evidence showing that there is no genuine dispute of material fact. *See, e.g., Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). There is simply no genuine dispute of material fact on this issue—the only proffered evidence establishes that the actions identified by Defendants do not constitute treatment.

### c. Delayed Treatment

In the course of raising other arguments, Defendants offer two statements that could be construed as a contention that Plaintiffs are not being denied treatment, but are instead experiencing a permissible delay in treatment. Citing an Eighth Circuit case, Defendants contend that "with regard to HCV specifically, at least one Circuit Court has recognized that the question under the Eighth Amendment is…whether [HCV] presents a serious medical need for *prompt* treatment." [Filing No. 174 at 29 (emphasis added).] And Defendants state that "Plaintiffs' experts have also explained that patients can go up to five or six years without curative treatment without adverse consequences, but even if there were any such consequences, successful treatment with a DAA reverses the effects of fibrosis." [Filing No. 174 at 30.]

First, the evidence cited by Defendants simply does not state that patients "can go up to five or six years without curative treatment without adverse consequences." The portion of

testimony that refers to a five or six year time period states as follows: "Before[,] at the end of interferon and ribavirin therapy [drugs that predated DAAs], we have to wait five or six years to see we don't have effective treatment. Those patients wait, and nothing happen[s] to them. But I don't think that today when we have such effective therapy[,] if the patient is indicated[,] why we should wait." [Filing No. 173-4 at 34-35.]

The undisputed evidence establishes that there is no medical reason to delay HCV treatment with DAAs where the use of those drugs is not medically contraindicated. Moreover, the undisputed medical evidence is that delaying treatment for chronic HCV until patients have developed more advanced stage liver fibrosis has been demonstrated to result in two to five times higher rates of liver-related mortality, as compared to those offered treatment at an earlier stage. [Filing No. 100-1 at 6.] And the undisputed medical evidence establishes that the test used by IDOC to estimate the degree of liver fibrosis is not a good predictor at earlier stages of infection, and the disease progresses at different rates in different people. Dr. Vuppalanchi's undisputed testimony is that DAAs should not be reserved for only those with the most advanced disease progression, and that patients not treated for their HCV face a substantial likelihood of significant resulting injury. [Filing No. 166-4 at 62.] Defendants also do not dispute Plaintiffs' medical evidence regarding the symptoms suffered by patients as their disease progresses, including, among other things, pain, accumulation of fluid in the abdomen, diabetes, and the risk of kidney failure. These certainly must constitute "adverse consequences" of non-treatment.

Any "delayed treatment" argument asks the Court to infer from Defendants' evidence that when an inmate's HCV becomes severe enough, based on the priority criteria, he will receive treatment. In other words, an inmate must wait until his disease is exacerbated to the point that he becomes a high priority, or justifies an exception to the priority criteria. But Defendants have not

offered any evidence as to the priority group of the individuals who have received treatment or the average length of time before they receive it. And, perhaps more critically, they have not stated that it is their intention to treat even the individuals who are categorized as high priority. The undisputed evidence also establishes that, as of September 2017, 483 inmates had APRI scores of 1.0 or greater, correlating with fibrosis of stage two or greater. Dr. Vuppalanchi's undisputed testimony is that stage two fibrosis is "clinically significant," and that at that stage "you start worrying about liver related outcomes." [Filing No. 166-4 at 48.] Yet, with only 41 individuals having received treatment, at most only 8.4% of those inmates had received treatment. In short, Defendants fail to offer any evidence that an inmate will necessarily receive treatment following such a delay.

As described above, the Seventh Circuit has already concluded that this approach is impermissible in the context of opting for an ineffective treatment over an effective one. *See Arnett*, 658 F.3d at 751 ("That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." (internal quotation and citation omitted)). And that court has made clear that "[p]rison staff cannot bide their time and wait for an inmate's sentence to expire before providing necessary treatments." *Mitchell v. Kallas*, 895 F.3d 492, 496 (7th Cir. 2018). The same reasoning applies here.

Defendants are not entitled to summary judgment on the basis of the "promptness" of HCV treatment.

### d. Propriety of Treatment with DAAs

Finally, Defendants argue that Plaintiffs cannot satisfy the subjective element of the deliberate indifference standard, because their claim depends on the faulty assertion that all HCV-

infected inmates should be treated with DAAs. [Filing No. 174 at 30.] Defendants argue that Plaintiffs' own medical evidence establishes that "it is not a violation of the standard of care not to prescribe a DAA to every patient." [Filing No. 174 at 30.]

Defendants' entire argument on this point depends upon the undisputed medical evidence, and they have, unfortunately, taken some liberties in their presentation of that evidence. Dr. Liangpunsakul testified that he prescribes DAA medication to nearly all individuals (1) who have tested positive for HCV; (2) who carry a viral load; and (3) for whom treatment is not medically contraindicated. [Filing No. 173-4 at 8-9.] In cases where treatment is medically contraindicated due to other illnesses, Dr. Liangpunsakul may tell the patient that their HCV is not the "high priority," because they have "other cancers or…advanced diseases that need to be focused [on] at that particular moment." [Filing No. 173-4 at 13.] He testified that, outside of the medical contraindication category, he has always recommended treatment with DAA medication. [Filing No. 173-4 at 13.]

While Defendants cite Dr. Liangpunsakul's testimony as reflecting a belief that it is not a violation of the standard of care not to prescribe DAAs to every patient with HCV, in doing so Defendants cherry-pick one sentence of his testimony to the exclusion of critical sentences that precede and follow. The Court reproduces that doctor's cited testimony in its entirety:

> Q: Is it your opinion that every patient with Hepatitis C except those with a short life span should be prescribed a DAA?
>
> A: I do believe so.
>
> Q: It is your opinion [that] it's a violation of the standard of care not to prescribe a DAA for a patient in that category?
>
> A: I would not say it's a violation of [the] standard of care. Standard of care is there, you know, for us to follow, and then we should do the best as possible to provide the patients who were diagnosed with Hep C with the medication that is now so effective to treat them. And this will eventually prevent subsequent future complications that may develop. There's so many bad events that could happen.

[Filing No. 173-4 at 14-15.] Elsewhere in his deposition in this matter, Dr. Liangpunsakul testified as follows:

> Q: In your opinion[,] is it ever reasonable not to recommend treatment with a DAA, again, ignoring the population with the short life spans?
>
> A: No. I'm an advocate of treating them.

[Filing No. 173-4 at 32.] Dr. Vuppalanchi, Plaintiffs' other expert witness, testified as follows:

> Q: And as I understand it, your opinion is that every offender in the Department of Corrections with Hepatitis C should be treated with a DAA?
>
> A: Yes.
>
> Q: I'm assuming that means unless they have a contraindication?
>
> A: Yes

[Filing No. 173-3 at 40.] And Dr. Vuppalanchi testified that the standard of care for chronic HCV requires treatment with DAA medication. [Filing No. 173-3 at 30.]

Both Dr. Liangpunsakul and Dr. Vuppalanchi testified in no uncertain terms that they would decline or delay the prescription DAA medication in heavily circumscribed instances, all involving medical contraindications (including active drug or alcohol use and concerns with therapeutic compliance), or instances in which a payor would not provide authorization or payment for the medication. [See Filing No. 173-3 at 21-24; Filing No. 173-3 at 31; Filing No. 173-3 at 35-36; Filing No. 173-3 at 39-40; Filing No. 173-3 at 42-43; Filing No. 173-3 at 48-49; Filing No. 173-3 at 52-55; Filing No. 173-4 at 9-15; Filing No. 173-4 at 25-35.] But as Dr. Vuppalanchi indicated as to even those circumstances, the physician's goal should always be to treat and cure the disease when the barrier to treatment is removed. [See, e.g., Filing No. 173-3 at 31 (regarding the standard of care being the prescription of DAA medication: "Q: Does that…apply to every single patient[,] or is every patient different? A: To me, there should be [an] intent to treat. And

then if contraindications prohibit you from treating, then you can back off.  Q: And what would you interpret to mean intent to treat?  A: It's a curable disease, and there is [a] cure.").][8]

In sum, the Court has considered all of Defendants' arguments regarding the subjective element of the deliberate indifference standard.  For the reasons described above, the Court concludes that Defendants are not entitled to summary judgment on Plaintiffs' deliberate indifference claim.

### 4. Subjective Element: Plaintiffs' Motion for Summary Judgment

Having concluded that Defendants are not entitled to summary judgment, the Court now turns to Plaintiffs' arguments in support of their Motion.  Plaintiffs contend that the undisputed evidence establishes that they have satisfied the subjective element of the deliberate indifference standard, because Defendants are aware of the substantial risk of both present and future harm to HCV-infected inmates, and Defendants have disregarded the risk by electing not to treat 98.8% of infected inmates.  [Filing No. 167 at 20-26.]

As is sometimes the case with cross-motions for summary judgment, the Court's discussion regarding Defendants' Cross-Motion also forms the basis for its discussion of Plaintiffs' Motion.  And the Court must stress that the outcome in this case is largely determined by the fact that Defendants, as described at length above, simply have not put forward any admissible evidence to support a finding either that HCV does not constitute a serious medical need, or that Defendants are not knowingly disregarding it.  This is the key distinction between this case and *Chimenti v.*

---

[8] Defendants' treatment of the evidence on this issue brings to mind the Seventh Circuit's admonition to parties regarding appropriate summary judgment practice, particularly regarding cherry-picking isolated portions of deposition testimony.  As the court noted in that case, this strategy almost always fails, quickly destroys litigants' credibility with the court, and is both costly and wasteful.  *Malin v. Hospira*, 762 F.3d 552, 564-65 (7th Cir. 2014).

*Wetzel*, 2018 WL 3388305, at * (E.D. Pa. July 12, 2018), another HCV class-action case that has reached summary judgment in another district court.

In that case, which involves a slightly different treatment protocol, the defendants moved for summary judgment and presented medical evidence to support the contention that individuals with Metavir scores of F0 or F1 do not have serious medical needs, and therefore are not being denied treatment. *Chimenti,* 2018 WL 3388305, at *10-11. The plaintiffs presented medical evidence that those patients do indeed have serious medical needs. *Id.* In light of the disputed material facts, the court concluded that summary judgment was not appropriate. *Id.* at 12 ("…the record contains evidence that patients who have chronic HCV and whose Metavir scores are less than F2 have serious medical needs, as they may suffer from fatigue and other nonhepatic symptoms of their infections and, if not treated with DAAs before their disease progresses, may suffer from liver inflammation, liver fibrosis, liver cancer and liver-related mortality that they would not suffer if they were treated with DAAs while their Metavir scores are in the F0 to F1 range.").

Here, however, the undisputed record evidence establishes that individuals with untreated chronic HCV face a substantial risk of harm. Individuals suffering from chronic HCV face a variety of immediate symptoms, as well as the certainty that their disease will progress through the stages of infection. Defendants do not argue, and present no evidence, that individuals in earlier stages of infection necessarily experience lesser or less severe symptoms, such that HCV at its earlier stages does not pose a substantial risk of harm. The undisputed evidence establishes that, once chronic, the disease inevitably progresses, and that the speed of progression cannot be predicted with certainty. The undisputed evidence also establishes that the metric used by Defendants to measure disease progression is not effective at distinguishing between degrees of

infection before the disease becomes advanced.  *See Chimenti,* 2018 WL 3388305, at \*12 ("There is also evidence that the DOC's reliance on an inaccurate method of testing for fibrosis could result in the DOC's failing to treat many individuals who suffer from advanced fibrosis and cirrhosis."). For all of these reasons, and those discussed in relation to Defendants' Cross-Motion, the Court concludes that Plaintiffs face a substantial risk of harm.

Second, the undisputed evidence establishes that chronic HCV is a curable disease, and the only effective treatment—oral DAA medication—can cure it within eight to twelve weeks.  While IDOC's mandatory treatment policy requires the classification of inmates according to their APRI score the undisputed evidence establishes that there is no medical reason to divide individuals by "priority" or to ration the use of DAAs.  And Defendants have provided no other rationale for the prioritization system.  Dr. VanNess was aware at the time of the drafting of HCSD 3.09 that the prioritization policy differs from the nationally accepted standard of care for chronic HCV, as articulated by the AASLD Guidance, and that DAAs cure HCV.

While 41 individuals have received treatment over the span of more than a year, 98.8% of individuals suffering from chronic HCV have received no treatment at all.  This can be described in no other way than an effective denial of treatment for those suffering from chronic HCV.

The Court therefore concludes that Plaintiffs have satisfied both the objective and subjective elements of the deliberate indifference standard.  Accordingly, the Court concludes that Defendants have violated the Eighth Amendment, and Plaintiffs are entitled to summary judgment on that claim.

### B. ADA and Rehabilitation Act Claims

Defendants also move for summary judgment on Plaintiffs' ADA and Rehabilitation Act claims.  They contend that Plaintiffs' claims must fail because (1) they cannot show that they are

qualified individuals with a disability; and (2) they have not shown any evidence that Defendants intend to discriminate against inmates with HCV. [Filing No. 174 at 33-36.] Defendants also reprise several of their deliberate-indifference arguments, contending that Plaintiffs are receiving appropriate treatment under the care of Wexford physicians. [Filing No. 174 at 36.] In response, Plaintiffs argue that there is a genuine dispute of material fact regarding whether all or some members of the Plaintiff class are "qualified individuals" with disabilities under the Acts. [Filing No. 179 at 32-33.]

The analysis governing ADA and Rehabilitation Act claims is the same, "except that the Rehabilitation Act includes as an additional element the receipt of federal funds, which all states accept for their prisons." *Jaros v. Illinois Dep't. of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). Because the relief available under both statutes is coextensive, *id.*, the Court analyzes them together. To prevail on a claim under those Acts, plaintiffs must show that they (1) are qualified persons (2) with a disability, and (3) that Defendants have denied them access to a program or activity because of their disabilities. *Id.* "Disability" includes the physical or mental limitation of one or more major life activities, such as walking, bending, standing, caring for oneself, performing manual tasks, seeing, hearing, sleeping, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. *See, e.g., Rowlands v. United Parcel Serv. – Ft. Wayne*, 2018 WL 4041258, at *6 (7th Cir. Aug. 24, 2018).

In their response, Plaintiffs acknowledge the possibility that the ADA and Rehabilitation Act claims are not amenable to resolution via the currently defined class. The standard that applies to those claims requires an assessment of whether a specific major life activity has been limited by an individual's physical or mental impairment. And while Plaintiffs have provided ample medical evidence that HCV can cause symptoms that could lead to such limitations, and that hundreds of

class members have fibrosis of stage two or greater, those facts do not necessitate a determination that all class members suffer from the limitation of a major life activity. *See, e.g., Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 449-51 (7th Cir. 2001) (concluding that plaintiff who suffered from cirrhosis caused by chronic Hepatitis B did not establish that his reduced liver functioning resulted in the limitation of a major life activity).

The Court concludes, therefore, that decertification is necessary as to the ADA and Rehabilitation Act claims. As described above, in the case of a class certified under Rule 23, "the judge remains free to modify it in the light of subsequent developments in the litigation." *Falcon,* 457 U.S. at 160. That includes the ability to decertify a class should circumstances so dictate. *Eggleston v. Chic. Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 896 (7th Cir. 1981). Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." And commonality "demands more than a showing that the class members have all suffered a violation of the same provision of law at the hands of the same defendant." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014). At a minimum, it is not clear that all class members, as the class is currently defined, suffer from the limitation of a major life activity.

The Court, therefore, decertifies the class as to Plaintiffs' ADA and Rehabilitation Act claims. Accordingly, it also **DENIES** Defendants' Cross-Motion for Summary Judgment as to those claims, but without prejudice to refiling them regarding the individual plaintiffs' claims.

### C. Dr. VanNess and Ms. Gipson

In one paragraph in their brief in support of their Cross-Motion for Summary Judgment, Defendants argue that Dr. VanNess and Ms. Gipson should be dismissed as defendants in this matter. [Filing No. 174 at 25.] Defendants argue that because Commissioner Carter is "the final authority for all policies," neither Dr. VanNess nor Ms. Gipson can order the relief Plaintiffs seek.

[Filing No. 174 at 25.]  Therefore, Defendants argue, they are not proper defendants, and should be dismissed.  In response, Plaintiffs offer no argument as to Ms. Gipson, and, in so doing, concede her dismissal.  [Filing No. 179 at 33.]  As to Dr. VanNess, Plaintiffs argue that he "has the authority to make HCSD 3.09 the policy and did so in this case."  [Filing No. 179 at 33.]  Plaintiffs also contend that Dr. VanNess may be able to provide some relief to Plaintiffs, because he "has the power to request annual expenditures of over $1.5 million for HCV medication, but has chosen not to exercise such power."  [Filing No. 179 at 33.]  In reply, Defendants dispute Plaintiffs' characterization of Dr. VanNess's role, arguing that Commissioner Carter must sign the HCSD 3.09 policy and is "the ultimate authority" on all directives.  [Filing No. 180 at 18.]

As the Seventh Circuit has outlined, a prison official cannot be liable for the misdeeds of a subordinate under a theory of *respondeat superior*.  *Vance v. Peters*, 97 F.3d 987, 992-93 (7th Cir. 1996).  But, as that court has explained:

> an official satisfies the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.  That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.  In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery.

*Vance*, 97 F.3d at 993 (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (internal quotations omitted)).  Defendants' only argument in support of dismissal of Dr. VanNess is that he does not have final approval authority over HCV treatment policies, and therefore that he alone cannot provide the injunctive relief that Plaintiffs seek.  However, the standard does not require that Dr. VanNess be able to singlehandedly remedy the complained-of wrong in order to be a proper defendant.  And the undisputed evidence establishes that Dr. VanNess is responsible for drafting the HCV policy at issue, is tasked with overseeing Wexford's compliance with that policy and contractual agreement, and is charged with approving additional expenditures for HCV

treatment. This evidence is sufficient to show that Dr. VanNess facilitated, approved of, or condoned the actions challenged by Plaintiffs.

For these reasons, Defendants' request to dismiss Ms. Gipson as a defendant is **GRANTED**, and their request to dismiss Dr. VanNess is **DENIED**.

### V.
#### CONCLUSION

As the Seventh Circuit has made clear, not every refusal of medical treatment constitutes cruel and unusual punishment. "Medical 'need' runs the gamut from a need for an immediate intervention to save the patient's life to the desire for medical treatment of trivial discomforts and cosmetic imperfections that most people ignore. At the top of the range a deliberate refusal to treat is an obvious violation of the Eighth Amendment, and at the bottom of the range a deliberate refusal to treat is obviously not a violation. Where to draw the line between the end points is a question of judgment that does not lend itself to mechanical resolution." *Johnson*, 433 F.3d at 1013-14. The Court concludes that the undisputed evidence in this case establishes that Plaintiffs' need for medical treatment is toward the high end of the range, and Defendants' deliberate refusal to provide that treatment constitutes a violation of the Eighth Amendment.

For the foregoing reasons, the Court:

- **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' evidentiary objections, as set forth above [166];

- **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss Dr. VanNess and Ms. Gipson as defendants, to the extent that it **DISMISSES** Ms. Gipson [173];

- **DENIES** Defendants' Cross-Motion for Summary Judgment on all claims [173];

- **MODIFIES** the class definition to include all current and future prisoners in IDOC custody who have been diagnosed, or will be diagnosed, with chronic HCV, and for whom treatment with DAA medication is not medically contraindicated;

- **DECERTIFIES** the certified class as to the ADA and Rehabilitation Act claims only [154]; and

- **GRANTS** Plaintiffs' Motion for Summary Judgment as to liability on the Eighth Amendment claim. [166]

The Court requests that the Magistrate Judge confer with the parties at his earliest possible convenience in order to establish a schedule for the remaining proceedings. Specifically, as Plaintiffs are only entitled to one recovery, they should determine whether they seek to move forward as to the decertified ADA and Rehabilitation Act claims. And as to the Eighth Amendment claim, the parties should confer as to the development of a schedule for the remedy phase of the proceedings.

The Court also **ORDERS** the Clerk to update the docket to reflect that Plaintiffs raise this suit on behalf of themselves and other similarly situated individuals.

Date: 9/13/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**