IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL RAY STAFFORD, <br> CHARLES SMITH and DOUGLAS SMITH, <br> individually, and on behalf of those <br> similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT E. CARTER, JR., et al., <br><br> Defendants. | Case No. 1:17-cv-289-JMS-MJD |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION**

**I.    Introduction**

This case arises out of Defendants' failure to treat Plaintiffs with chronic Hepatitis C virus ("HCV") in accordance with the medical standard of care. This Court has concluded that Defendants violate the Eighth Amendment of the United States Constitution by denying such treatment. [Filing No. 186 at 39, 44.] Plaintiffs respectfully move the Court to enjoin Defendants to immediately start treating their chronic HCV in accordance with the medical standard of care and the Eighth Amendment.

**II.    Facts**

    **A.    Hepatitis C Virus**

HCV is a contagious viral disease that causes inflammation of the liver and affects other parts of the body. [Filing No. 100-1 at 2; Filing No. 166-1 at 2.] HCV infection is generally transmitted through blood or blood products. [Filing No. 100-1 at 2.] Once an HCV infection moves into the chronic phase (approximately six months after the initial infection), individuals remain infected for life unless treated with appropriate medication. [*Id.* at 2-3.]

Doctors measure a patient's degree of fibrosis, or scarring of the liver, to determine the stage of infection a patient is experiencing. [Filing No. 166-4 at 18, 2:12.] The progression of fibrosis is described in progressive stages ranging from zero (or F0), where there is no fibrosis present, to four (F4), where advanced fibrosis (cirrhosis) is present. [*Id.*, 16:25.] There are several methods for measuring the degree of fibrosis. [*Id.*] One method, the APRI score, is based on biomarkers and uses routinely available blood tests to estimate fibrosis levels. [*Id.* at 22, 5:24.] HCV progression can also be measured by a device called a FibroScan, which non-invasively measures liver stiffness. [*Id.* at 18, 2:12.]

### B. Chronic HCV is a Curable Disease

Chronic HCV can be cured through treatment with Direct-Acting Antiviral oral medications ("DAAs"). This treatment generally lasts 12 weeks. [*Id.* at 34, 22:24.] The current cure rate for patients treated with DAAs is nearly 100%. [*Id.* at 38, 9:24.] "DAAs are the only effective treatment for HCV..." [Filing No. 186 at 17 (citing Filing No. 166-4 at 60).] "[I]t is undisputed that there is no medical justification for dividing individuals into treatment categories based on the degree of fibrosis or the progression of their disease as determined by the APRI score." [*Id.* at 25 (citing Filing No. 166-1 at 4).]

### C. Chronic HCV is a Serious Medical Condition

Individuals with untreated chronic HCV face a substantial risk of harm. [*Id.* at 39.] "Absent treatment, HCV will inevitably progress through all of the stages of infection, leading to cirrhosis of the liver." [*Id.* at 15 (citing Filing No. 166-4 at 21-25).] Patients may experience symptoms such as fatigue, joint pain, nerve pain, skin disorders, jaundice, ascites, hepatic encephalopathy, gastrointestinal bleeding, and liver cancer. [*Id.* (citing Filing No. 100-1 at 2.)]

In addition to such symptoms, "[i]ndividuals suffering from chronic HCV face… the certainty that their disease will progress through the stages of infection." [*Id.* at 38.] The rate of

this progression is variable: it "may occur more quickly in individuals who are older at the time of infection, obese, have other viral diseases, or are subject to other factors that speed progression in individual cases." [Filing No. 186 at 15-16 (citing Filing No. 166-4 at 17).]

"Within twenty to thirty years of chronic infection, between five and twenty percent of HCV-infected persons will develop cirrhosis of the liver, and one to five percent of people will die from the consequences of chronic HCV." [*Id.* at 15 (citing Filing No. 100-1 at 3).] "Chronic HCV is the leading cause of cirrhosis of the liver and is the most common reason for liver transplantation in the United States." [*Id.* at 16 (citing Filing No. 100-1 at 3).]

Patients in earlier stages of infection face a substantial risk of harm.[1] "Even before HCV reaches an advanced stage, it can cause harm such as kidney failure, diabetes, decreased cognitive function, joint pain, nerve damage, and other conditions." [*Id.* at 16 (citing Filing No. 100-1 at 3).] "Delaying treatment for chronic HCV until patients have developed more advanced stage liver fibrosis has been demonstrated to result in two to five times higher rates of liver-related mortality, as compared to those offered treatment at an earlier stage." [*Id.* at 17-18 (citing Filing No. 100-1 at 6).] "Curing chronic HCV has been associated with reduced risk of liver cancer by 83.5% and overall death by 74%." [*Id.* at 18 (citing Filing No. 100-1 at 7).] "Curing chronic HCV is also associated with a decreased need for liver transplantation, and decreases patients' risk of dying from diseases other than HCV." [*Id.* (citing Filing No. 100-1 at 6).] "Patients cured of HCV also report improvements in their quality of life." [*Id.* (citing Filing No. 100-1 at 5).] For these reasons, among others, "'there is no medical reason to ration" the use of DAAs, and "delayed treatment is below the standard of care, is not medically defensible, and will cause harm." [*Id.* at 25 (citing Filing No. 166-1 at 4).]

---

[1] *See* Filing No. 186 at 38 ("Defendants do not argue, and present no evidence, that individuals in earlier stages of infection necessarily experience lesser or less severe symptoms, such that HCV at its earlier stages does not pose a substantial risk of harm.").

3

### D. Treating Chronic HCV with DAAs is the Standard of Care

In order to provide healthcare professionals with timely guidance regarding the treatment of HCV, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Diseases Society of America ("IDSA") convened a panel of experts known as the HCV Guidance Panel (the "Panel"). [Filing No. 166-1 at 3.] The Panel's guidance is set forth in a document called "HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C" (the "AASLD Guidance"). [Filing No. 166-1 at 3; www.hcvguidelines.org.]

The Panel recommends treatment with DAAs for all patients with chronic HCV infection, except those with short life expectancies that cannot be remediated by treatment, by transplantation, or by other directed therapy. [Filing No. 166-1 at 3.] The Panel's guidance is the medical standard of care with respect to the treatment of patients with HCV. [Filing No. 166-1 at 4; Filing No. 166-2 at 7.] The Centers for Disease Control encourages healthcare professionals to follow the Panel's recommendations. [Filing No. 100-1 at 4.]

### E. AASLD Guidance Recommends DAA Treatment in Prisons

The AASLD Guidance recommends that individuals in prison receive DAA treatment for chronic HCV, for several reasons. [Filing No. 183-1.]

#### 1. *DAA Treatment in Prisons is Logistically Feasible*

The AASLD Guidance states that DAA treatment "is now logistically feasible within the prison setting." [*Id.* at 4.]

> The availability of all-oral DAA regimens that commonly require no more than 12 weeks of therapy and cause few adverse effects overcomes many of the logistical challenges associated with interferon-based HCV treatment... Directly observed therapy is the norm in prison settings, and the risk of drug diversion is low.

4

[Filing No. 183-1 at 4; s*ee also* Filing No. 186 at 26 (the undisputed evidence shows "that inmates with HCV can be very effectively identified and treated while incarcerated, because they are in a controlled environment and under observation.") (citations omitted).]

2. *DAA Treatment of Inmates is Cost Effective*

The AASLD Guidance states that "treating chronic HCV in incarcerated persons is cost-effective." [Filing No. 183-1 at 4 (citation omitted).] See also Filing No. 166-2 at 7 ("Treating prisoners with the standard of care DAAs will be cost-effective.") (Expert Report of Suthat Liangpunsakul, M.D., M.P.H.); and Filing No. 166-1 at 5 ("Treating and curing prisoners with HCV would also effectively promote public health, for it would limit HCV transmission in and outside of prisons, and result in long-term cost savings.") (Expert Report of Raj Vuppalanchi, MBBS).

3. *Untreated Inmates Pose Infection Risk to Other Inmates and General Population*

When infected inmates are released and re-enter the general population, they contribute to the spread of HCV in the general population. [Filing No. 183-1 at 1.] If reincarcerated for new crimes, they promote the spread of HCV within correctional settings. [*Id.*]

4. *Increased HCV Treatment in Correctional Settings will Aid HCV Elimination*

The AASLD Guidance states that "[r]eturning inmates to their communities cured of chronic HCV would be an *invaluable step* toward HCV elimination." [*Id.* at 4 (citation omitted) (emphasis added).]

More pointedly, the treatment of infected inmates is *critical* to the success of national efforts to eliminate HCV:

> Given the high prevalence of HCV among persons in the US correctional system, t*he success of the national HCV elimination effort will depend on* identifying chronically infected individuals in jails and prisons, linking these persons to medical care for management, and providing access to antiviral treatment... ,

5

[Filing No. 183-1 at 1 (citations omitted) (emphasis added); *see also* "Follow California's Lead: Treat Inmates With Hepatitis C, " Health Affairs Blog, July 24, 2018 ("Since the prison system has the highest concentration of people living with the virus, *failure to scale up treatment in prisons dooms any effort to eliminate hepatitis C* in America.") (emphasis added), available at https://www.healthaffairs.org/do/10.1377/hblog20180724.396136/full/, last accessed March 24, 2019; *and* Filing No. 218-1 (Noreen Marcus, "Hepatitis C Fight Hinges on Prisons," U.S. News & World Report (February 5, 2019) (experts say hepatitis C is a public health problem that "can't be solved in the U.S. overall without first tackling it within prison walls"), also available at https://www.usnews.com/news/healthiest-communities/articles/2019-02-05/hepatitis-c-fight-hinges-on-prisons-inmate-care, last accessed March 24, 2019).]

### F. IDOC Treats Only a Small Fraction of Inmates with Chronic HCV

The record makes clear that only a small fraction of inmates with chronic HCV receives DAAs: "[a]s of September 2017, there were 3,476 inmates identified as suffering from chronic HCV…" [Filing No. 186 at 19 (citing Filing No. 166-7 at 1-2).] "While 41 individuals have received treatment over the span of more than a year, 98.8% of individuals suffering from chronic HCV have received no treatment at all." [*Id.* at 39.] As this Court concluded in its Order dated September 13, 2018, "[t]his can be described in no other way than an effective denial of treatment for those suffering from chronic HCV." [*Id.* at 20.]

### G. IDOC Purports to Prioritize Plaintiffs for Treatment

IDOC contracts with Wexford of Indiana, LLC ("Wexford") to provide medical services to individuals incarcerated in IDOC facilities. [Filing No. 186 at 18 (citing Filing No. 166-5).] Wexford's contract requires it to abide by IDOC's health care directives, including "Health Care Services Directive 3.09" ("HCSD 3.09"). [*Id.* (citing Filing No. 166-5 at 2; Filing No. 166-6).] HCSD 3.09 was drafted by William C. VanNess, II, M.D., IDOC's (now former) Chief Medical

6

Officer. [Filing No. 186 at 18 (citing Filing No. 166-9 at 40; Filing No. 166-9 at 91).] Dr. VanNess was also tasked with overseeing Wexford's compliance with HCSD 3.09 and the contractual agreement. [*Id.* at 42-43.]

HCSD 3.09 mandates that health services staff "manage offenders with HCV in accordance with the Federal Bureau of Prison's [sic] 'Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection.'" [*Id.* at 18 (citing Filing No. 166-6 at 2).] The Federal Bureau of Prisons Guidance ("FBOP Guidance"), upon which HCSD 3.09 purports to rely, sets out a policy whereby inmates with higher APRI scores given higher priority for treatment over those with lower APRI scores. [*Id.* at 18-19 (citing Filing No. 166-12 at 8, 13).] Dr. VanNess was aware at the time of the drafting of HCSD 3.09 that FBOP's prioritization policy differs from the medical standard of care as set forth in the AASLD Guidance. [*Id.* at 19 (citing Filing No. 166-8 at 98-100).]

### H. Indiana Medicaid Patients with Chronic HCV Will Receive DAAs Regardless of Stage

In a related matter involving the rationing of DAAs, the State of Indiana recently entered into a stipulated settlement agreement with respect to the treatment of Medicaid patients with chronic HCV. [Filing Nos. 211 at 1, and 211-1.] The matter was styled *Tenneil Selner, et al. v. Secretary of the Indiana Family and Social Services Administration, in her official capacity*, Case No. 1:15-cv-01874-SEB-MPD, U.S. District Court for the Southern District of Indiana. [Filing No. 211 at 1.] The agreement was contingent upon the certification of class consisting of:

> Any and all adult Medicaid recipients in Indiana, current and future, with a diagnosis of chronic Hepatitis C, genotype 1, who have been prescribed one of the direct-acting antiviral medications enumerated in the 2016 Policy or 2018 Policy, by or in consultation with an Infectious Disease or GI specialist, but do not meet the medical requirements of such policy to receive Medicaid Reimbursement for that prescribed medication.

[Filing No. 211-1 at 1, 4.]

7

The plaintiff in *Selner* claimed that certain policies of the Family and Social Services Administration ("FSSA") violated Medicaid law, namely, those that govern when Medicaid recipients with chronic HCV may receive Medicaid reimbursement for several DAAs. [Filing No. 211-1 at 3-4.] Defendant denied these allegations. [*Id.* at 4.] Selner alleged that FSSA rationed DAAs, and imposed restrictions so that Medicaid recipients with chronic HCV could only access DAAs if:

1. Their fibrosis had advanced to F2 or higher;
2. They were co-infected with HIV or AIDS;
3. They were post-liver transplant; or
4. They had another comorbidity associated with rapid progression of fibrosis.

[Filing No. 218-2 at 11 (*Selner* Docket No. 132).]

The settlement agreement provided that FSSA *will eliminate any restrictions based upon fibrosis level or severity of disease* for Medicaid recipients with chronic HCV to receive Medicaid reimbursement for DAAs *by July 1, 2019*. [Filing No. 211-1 at 4, and Filing No. 211 at 1 (emphasis added).] The Court certified the class, conducted a fairness hearing, and found the stipulated settlement agreement to be fair, reasonable and adequate, and approved it. [Filing Nos. 218-3 at 1, and 218-4 at 2 (*Selner* Docket Nos. 159, 167).] The class size was not exactly known, but the plaintiff pointed out that over 7,246 denials of requests for DAAs were issued between October 1, 2016 and June 1, 2017. [Filing No. 218-5 at 5 (*Selner* Docket No. 115).]

### III. Procedural History

The named Plaintiffs filed the instant suit on behalf of themselves and similarly situated present and future IDOC inmates, claiming that IDOC's failure to treat their chronic HCV violates the Eighth Amendment. [Filing No. 39.] The Court defined the class to comprise: "all current and future prisoners in IDOC custody who have been diagnosed, or will be diagnosed,

8

with chronic HCV, and for whom treatment with DAA medication is not medically contraindicated." [Filing No. 186 at 43.]

In an order dated September 13, 2018, this Court granted Plaintiffs' motion for summary judgment as to Defendants' liability on the Eighth Amendment claim. [Filing No. 186 at 44.] The Court directed the parties to "confer as to the development of a schedule for the remedy phase of the proceedings" regarding Plaintiffs' Eighth Amendment claim. [*Id.*] After subsequent settlement negotiations, this Court granted Plaintiffs' motion to convert the trial set in this matter to a remedy hearing. [Filing No. 205.]

## IV. Argument

Plaintiffs are entitled to a permanent injunction for the reasons set forth below.

### A. Permanent Injunction Standards

#### 1. *Federal Rule of Civil Procedure 65*

Federal Rule of Civil Procedure 65 provides that every order granting an injunction must: "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail… the act or acts restrained or required." Fed. R. Civ. P. 65(d). At the same time "the injunction must also be broad enough to be effective, and the appropriate scope of the injunction is left to the district court's sound discretion." *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010) (citation omitted). *See also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2941 at nn. 9-10 (3d ed. 2018). ("[B]ecause of its discretionary character, an injunction decree typically is drafted in flexible terms, can be molded to meet the needs of each case, and may be modified if circumstances change after it is issued or in the event that it fails to achieve its objectives.").

### 2. *Federal Caselaw*

Plaintiffs seek a permanent injunction, having prevailed upon their Eighth Amendment claim. [Filing No. 186, p. 44.] "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury[2]; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Lindh v. Warden, Fed. Correctional Inst., Terre Haute, Ind.*, 2:09-CV-00215-JMS, 2013 WL 139699, at *16 (S.D. Ind. Jan. 11, 2013).

### 3. *Prison Litigation Reform Act*

The Prison Litigation Reform Act ("PLRA") provides that in a civil action regarding prison conditions, "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Additionally, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.* Prospective relief is defined by the PLRA as "all relief other than compensatory monetary damages..." 18 U.S.C. § 3626(g)(7).

The PLRA does not change the standards for determining whether to grant injunctive relief. *Jones-El v. Berge,* 164 F. Supp. 2d 1096, 1116 (W.D. Wis. 2001).

---

[2] *Cf. Walgreen Co. v. Sara Cr. Prop. Co., B.V.*, 966 F.2d 273, 275 (7th Cir. 1992) ("'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment [citations omitted]. It has nothing to do with whether to grant a permanent injunction, which, in the usual case anyway, is the final judgment.").

10

### B. Plaintiffs Will be Irreparably Injured Without an Injunction

Absent an injunction, Plaintiffs will be irreparably injured by Defendants' continuing failure to treat their chronic HCV, which causes them to suffer from HCV-related symptoms and exposes them to an increased risk of disease and death, for the reasons described above in Sec. II(C). *See Jones-El,* 164 F. Supp. 2d at 1123 ("pain, suffering and the risk of death constitute 'irreparable harm' sufficient to support a preliminary injunction in prison cases."); *Lee v. State*, 869 F.Supp 1491, 1501 (D. Or. 1994) ("Death is overwhelmingly final and not subject to reversal, mitigation, or correction… Death constitutes an irreparable injury"); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1304 (N.D. Fla. 2017) ("If these inmates [with HCV] are not treated [with DAAs], they will undoubtedly suffer irreparable injury"); *Abu-Jamal v. Wetzel*, 2017 WL 34700, at *20 (M.D. Pa. Jan. 3, 2017) (unpublished) (inmate denied treatment for chronic HCV "will suffer irreparable harm if this Court does not grant a preliminary injunction," where: (a) "[h]e will continue to suffer from chronic hepatitis C"; (b) "[h]is liver will continue to scar and its functioning will continue to deteriorate"; and (c) "the efficacy of the DAA medications will likely be reduced if treatment is delayed"). *See also Farnam v. Walker*, 593 F. Supp. 2d 1000, 1012 (C.D. Ill. 2009) (absent an injunction regarding medical treatment for his cystic fibrosis, "[t]he plaintiff is at risk of irreparable harm: the shortening of his life."); and *Bontrager v. Indiana Family and Social Services Admin.,* 697 F.3d 604, 611 (7th Cir. 2012) (plaintiffs "will likely suffer irreparable harm if the injunction is not granted, as they would be denied medically necessary care").

### C. An Adequate Remedy at Law is Unavailable

Absent treatment, Plaintiffs' symptoms will worsen, their health will deteriorate, and their deaths will be hastened. Yet "[m]oney hardly seems an adequate remedy for a significantly decreased life expectancy or for significant pain and suffering from increased symptoms."

11

*Farnam*, 593 F. Supp. 2d at 1013 (cystic fibrosis patient lacks adequate remedy at law absent injunction for medical treatment).

Legal remedies are inadequate when, *inter alia*, "the nature of the loss incurred by the plaintiff makes it difficult to calculate damages." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1095 (7th Cir. 2008). In *Farnam*, a cystic fibrosis patient lacked an adequate legal remedy because, in part, of "the difficulty of putting a number on the harm to the plaintiff's health," life expectancy, and quality of life absent an injunction for medical treatment. *Farnam*, 593 F. Supp. 2d at 1013. *See also Foster v. Ghosh*, 4 F. Supp. 3d 974, 983 (N.D. Ill. 2013) (requiring prison officials to grant inmate access to ophthalmologist to evaluate his cataracts and worsening vision; "monetary relief… cannot adequately compensate for a known risk to his health that could be presently addressed."); *Flynn v. Doyle*, 630 F. Supp. 2d 987, 992-93 (E.D. Wis. 2009) (inmates "have no adequate remedy at law in that only injunctive relief will alleviate the risks at which they are placed by" prison officials' mismanagement of their medications, including "the exacerbation of chronic and acute serious medical conditions, and unnecessary pain and suffering").

The fact that Defendants violate Plaintiffs' constitutional rights strengthens the claims that the available remedies are inadequate and the threatened injuries irreparable. *See, e.g., Hamlyn v. Rock Is. County Metro. Mass Tr. Dist.*, 960 F. Supp. 160, 163 (C.D. Ill. 1997) (noting that "cases which have held that a constitutional wrong constitutes an irreparable injury involve some continuing or future injury which cannot be compensated by monetary damages alone," such as an "Eighth Amendment allegation concerning a continued threat to a prisoner's health or safety") (citations omitted); *Jolly v. Coughlin*, 894 F. Supp. 734, 740 (S.D.N.Y. 1995), *aff'd*, 76 F.3d 468 (2d. Cir. 1996) (plaintiff demonstrates irreparable injury absent an injunction "because he has alleged a constitutional [Eighth Amendment] violation, as well as harm that could not

12

adequately be compensated monetarily."); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2018) ("When an alleged deprivation of a constitutional right is involved… most courts hold that no further showing of irreparable injury is necessary.") (citations omitted).

### D.     The Balance of Harms Weighs in Favor of Plaintiffs

Defendants' refusal to treat Plaintiffs subjects the latter to ongoing harm and to a heightened risk of premature death. Without an injunction, Plaintiffs will continue to be denied necessary medical care, suffer pain unnecessarily, risk heightened mortality, and will continue to have their Eighth Amendment rights violated. Conversely, if an injunction issues, the Defendants will have to cease violating the Eighth Amendment. Defendants have yet to identify any hardship that IDOC will incur as a result of providing treatment pursuant to the standard of care. As this Court noted in its Order:

> Defendants *do not contend* that the prioritization system [of treating Plaintiffs with higher APRI scores first] was adopted on the basis of cost savings, and indeed they completely eschew cost as the motivating force. [*See* Filing No. 174 at 32 ("…the undisputed material facts establish that cost was not the deciding factor in determining IDOC policy.").] *Nor do Defendants argue that administrative convenience underlies* the policy, and *they have presented no evidence* that the administration of oral DAA medication to a larger number of inmates would impose an untenable administrative burden that this policy was intended to prevent.

[Filing No. 186 at 26 (emphasis added).]

The balance of harm necessarily tips in Plaintiffs' favor.

### E.     An Injunction Would Serve the Public Interest

An injunction would serve the public interest in several ways.

1.     Compelling Defendants to treat Plaintiffs would prevent them from spreading the disease to other inmates, and to members of the general population following release. *See, e.g.,* Filing No. 183-1 at 4 (("[r]eturning inmates to their communities cured of chronic HCV would

13

be an *invaluable step* toward HCV elimination.") (citation omitted) (emphasis added)); *Hoffer*, 290 F. Supp. 3d at 1304 (public interest served by enjoining state prison system to treat inmates with HCV, where such treatment "may have great impacts on reducing the prevalence of HCV outside prisons").

2. An injunction would aid the national effort to eliminate HCV, whose success depends upon the treatment of chronically infected individuals who are incarcerated. [Filing No. 183-1 at 1 ("the success of the national HCV elimination effort will depend on" treating chronically infected individuals in jails and prisons). Conversely, an injunction would cease behavior that tends to thwart the national effort to eliminate HCV.

3. An injunction would vindicate the public interest in protecting Plaintiffs' Eighth Amendment right to constitutionally adequate medical care. *See, e.g., Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("[U]pholding constitutional rights serves the public interest."); *Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir.1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest."); *Cade v. Coe*, 2017 WL 4856963, at *5 (S.D. Ill. Oct. 27, 2017) ("Anytime a citizen's constitutional rights are violated, the public interest in the vindication and protection of those rights is high."); *Hoffer*, 290 F. Supp. 3d at 1304 ("the public is undoubtedly interested in seeing that inmates' constitutional rights are not violated.").

4. An injunction would vindicate public interest in the humane treatment of inmates. *Cade*, 2017 WL 4856963, at *5 ("The public has an interest in the humane treatment of prisoners, not only because prisoners, like anyone else, possess innate human dignity").

For the foregoing reasons, all those described above in Sec. II(E), and each of them, the public interest would be served by an injunction.

### F. The Requested Injunction Comports with the PLRA

Plaintiffs move the Court to enjoin Defendants to provide Plaintiffs with the medical care to which they are constitutionally entitled. The requested relief comports with the PLRA because: (a) its sole goal is to correct the Eighth Amendment violation; (b) it does not ask the Court to do anything beyond correcting the Eighth Amendment violation; and (c) the Court has discretion to select the least intrusive means necessary to correct the Eighth Amendment violation. *See Peacher v. Payne*, 3:16-CV-701-TLS, 2017 WL 568598, at *2 (N.D. Ind. Feb. 13, 2017] (inmate "may be able to demonstrate that he is entitled [consistent with the PLRA] to a narrowly tailored injunction limited to requiring that he receive medical care as required by the Eighth Amendment.").

### V. CONCLUSION

For the foregoing reasons, a permanent injunction should issue, requiring the Defendants to provide all class members access to DAAs.

Respectfully submitted,

| | |
|---|---|
| *s/ Mark W. Sniderman* | *s/ Robert Katz* |
| Mark W. Sniderman | Robert Katz |
| FINDLING PARK CONYERS | INDIANA UNIVERSITY ROBERT H. |
| WOODY & SNIDERMAN, PC | MCKINNEY SCHOOL OF LAW |
| 151 N. Delaware St., Ste. 151 | 530 West New York Street |
| Indianapolis, IN 46204 | Indianapolis, IN 46202 |
| (317) 231-1100 T | (317) 278-4791 T |
| (317) 231-1106 F | |
| msniderman@findlingpark.com | |

*Attorneys for Named Plaintiffs Michael Ray Stafford, Charles Smith and Douglas Smith, and Class Members*