UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL RAY STAFFORD, *et al.* <br> Plaintiffs, <br><br> v. <br><br> ROBERT E. CARTER, Jr., *et al.* <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) CASE NO. 1:17-cv-00289-JMS-MJD <br> ) <br> ) <br> ) <br> ) |

**STATE DEFENDANTS' PRE-HEARING BRIEF AND
RESPONSE TO PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

Defendants, Robert E. Carter, Jr. and Kristen Dauss, M.D.[1], in accordance with the Court's Order dated February 4, 2009, (dkt. 209) and in response to Plaintiffs' motion for permanent injunction (dkt. 218), submit this memorandum for the Court's consideration in advance of the remedies hearing currently set for April 29, 2019.

**I. Introduction.**

There is no dispute that treatment of chronic Hepatitis C ("HCV") is a serious matter — for the population at large and for those who are incarcerated. Rather, the dispute in this case has centered not on whether HCV is a serious disease, but on who must be treated and at what stage of progression treatment with direct action antiviral drugs ("DAAs") required.

---

[1] Dr. Dauss is the proper defendant in place of Dr. Mitcheff, having assumed the position of chief medical officer of the Indiana Department of Correction, effective February 25, 2019. Per FRCP 25(d), she is automatically substituted as a party herein.

The Court has already ruled on the merits of the Eighth Amendment claim asserted by the class, finding that the IDOC's failure to provide DAAs to all offenders with chronic HCV constitutes a violation of the Eighth Amendment, and modified the class definition to include all current and future prisoners in IDOC custody who have been diagnosed, or will be diagnosed, with chronic HCV, and for whom treatment with DAA medication is not medically contraindicated. (dkt. 186.) Without waiving any issues or arguments they may raise on appeal, Defendants will not rehash old arguments here. The parties, at the direction of the Court, have stipulated that four issues will be presented for the Court's review at the remedies hearing:

1) Whether the Court should issue an injunction;
2) If it does issue an injunction, whether it should mandate treatment with DAAs for Class members with HCV;
3) If the Court does mandate treatment with DAAs, should treatment be universal or should treatment be cut off at a certain level of progression of the disease. If the latter, where should the cutoff be; and
4) If the court does mandate treatment with DAAs, what is a realistic timeline for implementation of such a mandate.

(dkt. 214.)

As outlined later in this memorandum, and as will be proven at the hearing, Defendants have already been proactive in addressing the issues identified by the Court in its Order dated September 13, 2018 (dkt. 186) and the Indiana Department of Correction has already taken steps to treat substantially more offenders with chronic Hepatitis C than had previously been done. If the Court, having found an Eighth Amendment violation, is inclined at this stage to agree with Plaintiffs and issue a permanent injunction mandating treatment for all offenders who suffer

chronic HCV within a certain time frame, Defendants must ensure that the Court is fully appraised of the staffing, logistical, and fiscal realities that surround such a mandate – each of which is a formidable obstacle.

Defendants do not concede that an injunction is necessary but agree that the scope and construction of any permanent injunction the Court *may* issue must be addressed at the remedies hearing. Rule 65(d) requires every injunction to "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "[A] court has an independent duty to assure that the injunctions it issues comply with" these requirements. *Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 631–32 (7th Cir.2003) (internal citation omitted). In addition, the fact-intensive nature of the claims in this lawsuit makes crafting an appropriate injunction particularly challenging. *Books v. City of Elkhart, Ind.* (Books I), 235 F.3d 292, 307 (7th Cir.2000) ("In crafting equitable relief to comply with our judgment today, the district court must ensure that, although the condition that offends the Constitution is eliminated, Elkhart retains the authority to make decisions regarding the placement of the monument.").

## II. Offenders in IDOC with HCV.

As of March of 2019, there are approximately 4,600 offenders in IDOC with either acute or chronic HCV. [dkt. 214, ¶9.] Assuming that approximately 15-25% of these offenders will self-resolve, dkt. 100-1 at 2, approximately 3,400 to 3,900

offenders are infected with chronic HCV. As Dr. Michael Mitcheff[2] and IDOC Chief Financial Officer Christina Reagle will testify at the remedies hearing, the coordination and resources required to treat all of these offenders necessitates that: (1) IDOC must have the funds to purchase DAA drugs; (2) IDOC must have the staffing to support the oversight and movement of a multi-fold increase in offenders receiving medical treatment; and (3) Wexford of Indiana must have adequate staffing to support a multi-fold increase in the actual treatment of offenders. Again, if the Court is inclined to issue a permanent injunction mandating universal treatment, these changes will take time to implement given the fiscal and staffing realities outlined below.

### III. Cost of Direct Action Antiviral Drugs and Current IDOC Budgetary Constraints[3].

As of January of 2019, the average cost for a 12-week course of DAA drugs for the treatment of HCV is approximately $24,868 per offender, with an additional cost of approximately $800 per offender for lab workups. In total, the cost to treat all current offenders with chronic HCV is somewhere between $87,271,200 and $100,105,200. This total sum does not include the administrative and staffing costs of providing treatment.

By comparison, the entire IDOC medical budget for fiscal year ("FY") 2019 is approximately $93,772,000[4]. That is the budget to treat every offender with any

---

[2] Dr. Mitcheff is the former IDOC Chief Medical Officer and is now an employee of Wexford of Indiana, a former co-Defendant in this case and the current medical provider for the IDOC.
[3] The information in this section is expected to be provided through the testimony of IDOC CFO Christina Reagle.
[4] This number includes $1.5M for the treatment of HCV with DAAs.

condition they might have, from supplying ibuprofen for joint pain to chemotherapy for cancer. That means that, even at the low-end, treatment of all chronic HCV offenders would cost approximately 93% of the current medical budget and would only treat one disease. Very simply, Defendants' ability to treat all offenders, regardless of their illness or injury, will be compromised if Defendants are ordered to immediately treat all offenders with HCV.

The medical budget is set by an appropriation of the Indiana General Assembly on a biennial basis. If the medical services fund is insufficient to cover needed costs, IDOC may move dollars from other IDOC funds to the Medical Services Fund with the approval of the State Budget Agency ("SBA"). As CFO Reagle will testify, the amount of available dollars in other IDOC funds fluctuates on an annual basis. These fluctuations are caused by any number of factors including IDOC staffing levels, the annual cost of maintenance of prisons and other facilities, dollars sent to local communities for housing lower-level offenders, community corrections programs, and other costs that change on a regular basis. These fluctuations can be illustrated by looking at the available dollars in IDOC funds at the end of fiscal years 2014 through 2018, which varied between $16.6M and $28.5M per year. And, of course, available dollars ultimately depend on how much is appropriated to the IDOC in the first instance.

Perhaps most importantly, though, is the fact that there is no mechanism, other than a legislative appropriation, to move dollars from the State General Fund to the IDOC Medical Services Fund. The appropriation in House Enrolled Act 1001 (2017) (available at http://iga.in.gov/legislative/2017/bills/house/1001#document-

5

d4d75ee8, last accessed April 1, 2019) ("HEA 1001") does not give the SBA authority to augment the dollars in the Medical Services Fund from the State General Fund. In contrast, HEA 1001 does give, for example, the SBA authority to augment the budget for Medicaid financial obligations in the event of an appropriation shortfall. *Id.* at 56, ¶2 ("Subject to the provisions of IC 12-8-1.5-11, if the sums herein appropriated for Medicaid current obligations and for Medicaid administration are insufficient to enable the office of Medicaid policy and planning to meet its obligations, then there is appropriated from the general fund such further sums as may be necessary for that purpose, subject to the approval of the governor and the budget agency.").

Defendants take issue with and seek to clarify two points in Plaintiffs' briefing regarding the cost of DAAs in this matter. *First*, Plaintiffs indicate that treatment of offenders with HCV with DAAs will be "cost effective." [dkt. 219 at 5.] That may well be true, not in the colloquial sense of the phrase, but using a complex definition of cost-effectiveness that is provided by the American Association for the Study of Liver Diseases. Summed up, treatment is "cost-effective" if it "provide[s] good benefit[s] for the resources invested, and providing such therapy to more people would be a good long-term investment." (AASLD Guidance on Cost, available at https://www.hcvguidelines.org/evaluate/cost, last accessed April 9, 2019). Even if treatment with DAAs may be "cost-effective" in the long run, it does not mean that treatment is feasible or affordable now; indeed, the AASLD guidance itself indicates as much, stating that cost-effectiveness determinations do not include "political or economic factors" that determine the "total resources that can be spent on HCV

6

treatment." *Id.* "Cost-effectiveness," as argued by Plaintiffs in their brief, does not establish the ability of Defendants to actually pay for the treatment at issue.

*Second,* while it is true that Defendants did not argue that cost or administrative convenience were relevant considerations during the Eighth Amendment merits phase of this action, *see* dkt. 219 at 13 (citing dkt. 186 at 26), both factors must be considered by the Court in shaping an appropriate remedy. At the merits phase of this lawsuit, the Court ultimately determined that the true matter at issue in this case is the medical standard of care. Since the IDOC had not factored cost or administrative convenience into that calculus, instead arguing that the prioritization scheme adopted from the FBOP was medically sound and passed constitutional muster, cost or administrative convenience were not germane to the arguments Defendants made during the merits phase of this lawsuit. But those issues are at the heart of the matter of effectively *implementing* this Court's summary judgment order and are therefore ripe for presentation now.

**IV. Constraints on care based on current IDOC and Wexford staffing.**

IDOC contracts with Wexford of Indiana, LLC ("Wexford") to provide medical services to individuals incarcerated in IDOC facilities. Pursuant to IDOC's policy for the management of offenders with chronic HCV, Wexford provides treatment to such offenders based on individual treatment decisions made by medical professionals Wexford employs. Dr. Mitcheff is expected to testify that it is administratively feasible to treat approximately 150-180 offenders per month after a short ramp-up period, but that treating that many offenders will require additional staffing resources, including at least one additional infectious disease specialist, additional

laboratory capacity, additional staff training, and administrative support. Wexford does not currently have the staffing and administrative capacity to treat 150-180 offenders per month.

Assuming that the appropriate number of DAAs can be funded and made available to be administered to all offenders with chronic HCV and all of the medical resources necessary can be obtained, treatment of the entire class of offenders can be completed in approximately 24 months. Because there are numerous ongoing requirements of chronic HCV treatment that include lab work, ultrasounds, obtaining of DAAs, supervision, and follow-up care, treatment of all offenders with chronic HCV in a timeframe less than 24 months, while maintaining the medical standard of care for all offenders, would be exceedingly difficult.

## V. Proposed Implementation Plan.

Understanding the import of this Court's summary judgment order, IDOC has moved quickly to increase from the status quo the number of offenders with HCV who receive DAAs. CFO Reagle is expected to testify that IDOC can reasonably expect to secure funding through the sources identified above to treat all offenders with an APRI score of 0.7 or higher (approximately 793 offenders) by September 30, 2021, at an approximate cost of $20.3M.[5] The number of offenders treated could increase if

---

[5] Defendants understand that the Court's summary judgment order ruled that the medical standard of care was that all offenders with chronic HCV should be treated with DAAs, regardless of fibrosis level or APRI score. However, as outlined above, based on current fiscal and logistical resources, only a subset of offenders can be treated immediately, and Dr. Mitcheff is expected to testify that the treatment of offenders with the highest APRI scores first is medically preferable to a regimen of treatment without regard to any relevant medical factors.

8

cost-effective pricing can be obtained for DAAs and the overall costs of DAAs are reduced.

However, from September, 2021, forward and as to the remainder of the offender population with APRI scores below 0.7., Defendants have no ability to treat all remaining offenders unless funding is secured from the Indiana General Assembly during the 2021 legislative session. If appropriated, that funding would generally become available July 1, 2021, and treatment of the remaining offenders with HCV could commence. Therefore, and based on the evidence to be proffered at the remedies hearing, Defendants will request that if the Court enters an injunction as to treatment of the remainder of the HCV population, that such treatment be completed by June 30, 2023.

Defendants further propose that the following class members should not be treated with DAAs because of the substantial risk of non-completion of treatment:

1) Current IDOC offenders who have not started treatment and who have less than eight months (32 weeks) remaining on their sentences. Dr. Mitcheff is expected to testify that a medically appropriate lab workup prior to treatment with DAAs takes approximately six weeks, file review by the infectious disease specialist and prescription of DAAs takes approximately two weeks, a standard course of treatment with DAAs takes approximately 12 weeks, and follow up testing is usually completed 12 weeks later to ensure that a negative viral load is achieved.

2) New IDOC offenders who have less than one year and two months of actual time to serve. As this Court noted in its summary judgment order,

9

approximately 15-25% of offenders with acute HCV with self-resolve, removing the necessity for treatment. [dkt. 186 at 15.] When an offender is initially tested for HCV upon intake to IDOC, it is possible that the offender will be in the acute stage of infection. Doing additional laboratory work during the first six months of incarceration will allow the IDOC to determine if an offender has progressed to the chronic stage of infection. If so, as noted above, eight months would be required to treat and then complete follow up testing to ensure a negative viral load. Of course, if during the course of the initial six-months of laboratory testing it is determined that an offender has advanced fibrosis or cirrhosis of the liver, it could be reasonably assumed that their HCV infection has progressed to the chronic stage and treatment could begin immediately.

Additionally, it is prudent to emphasize that while these limitations may prohibit some offenders from receiving treatment while incarcerated in IDOC, offenders released from IDOC will be eligible for the same or similar treatment under Medicaid, and IDOC is statutorily required to assist offenders in applying for Medicaid at the time they are released from an IDOC facility. Ind. Code § 11-10-12-5.3.

### VI. Conclusion.

The treatment of the offender population who have chronic Hepatitis C is a weighty matter, requiring careful examination of the staffing, logistical, and fiscal considerations inherent in expanding the scope of medical treatment for this population. The IDOC has already vigorously, and in good faith, moved to expand the

10

pool of individuals who will receive treatment with DAAs to nearly 800 offenders by September 30, 2021. As to the remainder of the offender population, any injunction the Court may be inclined to enter should fairly and justly acknowledge these staffing, logistical, and fiscal considerations and the remedy should be crafted in a way that is feasible for Defendants to implement. Defendants submit that with a sufficient legislative appropriation, treatment of all offenders with HCV could reasonably be accomplished by June 30, 2023.

                                  Respectfully submitted,

                                  CURTIS T. HILL, JR.
                                  Indiana Attorney General
                                  Attorney No. 13999-20

By:    Jonathan P. Nagy
        Deputy Attorney General
        Attorney No. 20975-49

OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN   46204
Phone:  (317) 233-8296
FAX:     (317) 232-7979
Email:   Jonathan.Nagy@atg.in.gov

## **CERTIFICATE OF SERVICE**

I certify that on April 9, 2019, a copy of the foregoing was filed electronically using the Court's CM/ECF system, sending notice to the following parties who may access this filing using the Court's system:

Mark W. Sniderman
SNIDERMAN NGUYEN LLP
mark@snlawyers.com

Robert A. Katz
INDIANA UNIVERSITY MCKINNEY
SCHOOL OF LAW
rokatz@iu.edu

                                                Jonathan P. Nagy
                                                Deputy Attorney General

OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN   46204
Phone:  (317) 233-8296
FAX:     (317) 232-7979
Email:   Jonathan.Nagy@atg.in.gov